## GULF, COLORADO AND SANTA FE RAILWAY COMPANY V. MAGGIE MATTHEWS ET AL.

### No. 1444.    Decided June 19, 1905.

**1.—Contributory Negligence—Walking on Railway Track—City Ordinance—Question of Fact.**

See statement accompanying certified question in this case for details of facts under which it is held that deceased should not be held negligent as matter of law in walking upon a railway track, where he was run over, though the defendant company had posted notices at its depots forbidding persons from entering or walking on its tracks, and by an ordinance of the city in which this occurred it was made a misdemeanor to trespass on the premises of another without his consent. The question was properly submitted to the jury as one of fact. (Pp. 163–172.)

**2.—Same—Licensee.**

See same statement for facts held sufficient to support a finding that one run over while walking on a railway track at a point where it was commonly used by pedestrians was a licensee. (Pp. 163–172.)

**3.—Evidence—Identity—Opinion.**

A witness was properly permitted to give his opinion as to the identity of a man seen by him walking on a railway track with one whose dead body was found thereon from the resemblance in form and clothes. (Pp. 171, 172.)

**4.—Evidence—Consent by Corporation.**

Where it was sought to show that one killed by a railway train was a licensee while walking on the track by proof of its common use as a footpath,

it was not competent for defendant's general manager to testify that it had never consented to such use.   (Pp. 171, 172.)

Questions certified by the Court of Civil Appeals for the Fifth District, in an appeal from Grayson County.

*Smith & Beaty, J. W. Terry* and *Lee, & Goree,* for appellant.—Acquiescence or consent to use a railroad company's track as a footpath can not be inferred from a mere use of the track by the public.   To warrant an inference of consent, the user must have been with the knowledge of officers and agents of defendant authorized to consent on its behalf to such use.   The railroad having expressly notified the public not to use its track as a foot-path, but to keep off its premises, a license or consent can not be inferred from a user by the public contrary to the notice.   A trespasser can not acquire rights by repeating his trespass or by repetition of an unlawful act make it lawful, or cast a duty other than not to wilfully injure on the party trespassed upon.

Matthews, under the evidence, was on the track contrary to the ordinances proved by defendant, was a trespasser, and special charge 3 should have been given.   Hyde v. Missouri Pac., 9 S. W. Rep., 483; Missouri Pac. v. Brown, 18 S. W. Rep., 670.

The railroad company could only be bound on the doctrine of consent or acquiescence when such consent or acquiescence was given by some agent or officer authorized to act for the railroad company in that connection.

The general offices of the defendant are at Galveston.   The proof shows the division officers of defendant were located at Cleburne.   There is absolutely no showing that any general officer of the railroad company ever knew of any extended use of the track at this point.   There was a conflict of the testimony as to the extent to which the track was used. Under the record therefore, the jury might well have found that the section foreman or men at Fort Worth had sufficient knowledge of the use of the track as would warrant an implication of acquiescence and consent from them, but yet would not have so found as to the general officers at Galveston or Cleburne.   The court's charge therefore, was, under the facts of this case, too general, and the special charge asked should have been given.   International & G. N. Ry. Co. v. Hanna, 58 S. W. Rep., 548; Bullock v. Houston, E. & W. T. Ry. Co., 55 S. W. Rep., 184; International & G. N. Ry. Co. v. Bert, 93 Texas, 348; San Antonio & A. P. Ry. Co. v. Lynch, 55 S. W. Rep., 517; Solomon Ry. Co. v. Jones, 2 Pac. Rep., 657; Union Pac. Ry. Co. v. Springsteen, 21 Pac. Rep., 774; Reid v. Bank of Mobile, 14 Am. & Eng. R. R. Cases, 554.

A corporation can only act by its agents, and where the evidence shows that only one particular party can act for a corporation in a particular matter, his statement that the corporation did not act is neither hearsay, opinion nor conclusion.

The statement of the witness Prince was the purest kind of opinion and conclusion on a question that was for the jury, and not shown to be a subject for expert or opinion testimony, under any rule.

The statement is an expression of an opinion without any such full and complete statement of the facts as would warrant the expression of the opinion in any event.

*Wolfe, Hare & Maxey,* for appellees.—The jury were not bound to believe the engineer and fireman to the effect that Matthews was lying on the track. Brown v. Griffin, 71 Texas, 659; San Antonio & A. P. Ry. Co. v. Brock, 80 S. W., 424; Ft. Worth & Rio Grande Ry. Co. v. Kime, 51 S. W., 558; Ft. Worth & Rio Grande Ry. Co. v. Kime (Supreme Court), 54 S. W., 240.

The presumption is that the deceased was in the exercise of due care, and that the burden of proof was upon appellant to show his contributory negligence. International & G. N. Ry. Co. v. DeBajligethy, 28 S. W., 829; Texas Mid. R. Co. v. Crowder, 64 S. W., 90; Lee v. International & G. N. Ry. Co., 89 Texas, 583; Southerland v. Texas & P. Ry. Co., 40 S. W. 195; Choate v. San Antonio & A. P. Ry. Co., 90 Texas, 88; Wallace v. Southern Oil Co., 91 Texas, 22; Joske v. Irvine, 91 Texas, 582; Garza v. Texas Mex. Ry. Co., 41 S. W., 172; Missouri, K. & T. Ry. Co. v. Scarborough, 68 S. W., 199; City of Hillsboro v. Jackson, 44 S. W., 1010; Kroeger v. Texas & P. Ry. Co., 69 S. W., 809; Texas & P. Ry. Co. v. Shoemaker, 98 Texas, 451.

To authorize the court to take the question from the jury, the evidence must be of such conclusive character that there is no room for ordinary minds to differ as to the conclusion to be drawn from it.

This proposition is fully sustained by the authorities under subdivision two, above.

The opinion in the Kime case, both in the 51 and 54 S. W., cited under first proposition above, is also a direct authority on this proposition. We also call the court's attention to the case of Gulf, C. & S. F. Ry. Co. v. Wagley, 40 S. W., 540.

From the long continued use of appellant's track by the public as a highway, the jury were authorized to find that it had consented to such use, and that the deceased had a right to be where he was. Gulf, C. & S. F. Ry. Co. v. Matthews, 66 S. W., 588; International & G. N. Ry. Co. v. Brooks, 54 S. W., 1056; Washington v. Missouri, K. & T. Ry. Co., 90 Texas, 319; Lee v. International & G. N. Ry. Co., 89 Texas, 583; Texas & P. Ry. Co. v. Watkins, 88 Texas, 25; St. Louis & Texas Ry. Co. v. Crosnoe, 72 Texas, 79; Missouri, K. & T. Ry. Co. v. Bellew, 54 S. W., 1079; S. C. 62 S. W., 99; International & G. N. Ry. Co. v. Woodward, 63 S. W., 1054; Texas & P. Ry. Co. v. Barrett, 57 S. W., 602; Texas & P. Ry. Co. v. Phillips, 37 S. W., 620; 40 S. W., 344; Law v. Missouri, K. & T. Ry. Co., 67 S. W. 1025.

It was not necessary that appellees should show that the president or general manager knew of or had consented to the use of the track by the public, but it was sufficient to show that those engaged in operating trains over the track at said point knew of such use, and the fact that the evidence showed that appellant by constructing steps had impliedly invited the public to use its roadbed as a footway, as well as the further fact of the continued, uninterrupted and constant use of said track for a period of more than twelve years, was evidence suffi-

cient to warrant submitting to the jury the question of consent and acquiescence.

Placing of warning notices at a distance of a mile and a half from the place where the accident happened, was not in itself sufficient evidence to conclusively establish that appellant had not consented to the use of its track; and in view of the further evidence that there were no warning notices placed near the point of accident, and that since the happening of said accident signs and warning notices have been placed along and about said track; and in view of the further fact, notwithstanding the ordinance making it a finable offense for any one to trespass upon the property of another, the evidence wholly fails to show any effort on the part of appellant to prosecute any person, who, as it contends, was violating such ordinance, the jury was warranted in finding as they did.  Galveston, H. & S. A. Ry. Co. v. Duelin, 86 Texas, 453; Texas Tel. & Tel. Co. v. Seiders, 29 S. W., 263; South Cot. Oil Co. v. Wallace, 54 S. W., 642; Prather v. McClelland, 28 S. W., 94.

The question as to whether or not appellant had consented to the use of its track by the public, was one of mixed law and fact, and it was not proper for the witness Polk to express an opinion thereon.

While a witness may be permitted in some cases to give an opinion or conclusion, this can not be done even by an expert, when the character of an act is in question and can be determined only by the application of the rules of law to a given state of facts.  Half, Weiss Co. v. Curtis, 68 Texas, 640; Gilbert v. Odum, 69 Texas, 670; Garrity v. Thompson, 67 Texas, 1; Gabel v. Weisensee, 49 Texas, 131; Morgan v. Fremont, 92 Iowa, 644.

It is proper for a witness to give an opinion upon questions of identity.  Cooper v. State, 23 Texas, 337; Osgood v. State, 49 S. W., 94; Gentry v. McMinnis, 33 Ky. (3 Dana), 382; Wiggins v. Henson, 68 Ga., 819; 1 Greenleaf's Evidence, sec. 440; Lawson Expert Evidence, 273; Rogers Expert Testimony, 10.

BROWN, Associate Justice.—Certified question from the Court of Civil Appeals of the Fifth Supreme Judicial District.  The statement and questions are as follows:

"We deem it advisable to present to the Supreme Court of the State of Texas for adjudication the following issues of law arising in the above entitled cause.

"Statement.

"This suit was instituted by appellee, Mrs. Maggie Matthews on behalf of herself and her minor children, against appellant to recover damages sustained on account of the alleged negligent killing of her husband, J. L. Matthews.

"It is alleged in substance that J. L. Matthews, on the 8th day of May, 1899, was walking along on appellant's railroad track within the corporate limits of the city of Fort Worth, where said track was commonly and habitually used as a pathway by pedestrians with the knowledge, consent and acquiescence of appellant; that while so walking along and upon said track, the said J. L. Matthews was, by the negligence of appellant's servants, operating one of its freight trains, in

running such train within the city limits at a greater rate of speed than allowed by an ordinance of said city and in negligently failing to ring the bell of the engine and to keep a lookout for persons who might be expected to be on its track, knocked down, run over and killed by said train. Appellant pleaded the general issue, contributory negligence, and specially that appellant had posted along its road in the city of Fort Worth warning notices to the public to the effect that all persons not having business with the company were forbidden to sit, stand or walk upon its railroad tracks and were prohibited from walking on or crossing the tracks of the company, except at legally established crossings; that the company did not consent to such use of its track and that no officer or agent of the company had authority by acquiescence or otherwise to consent to such use of the tracks, etc.; that J. L. Matthews was not walking along its track when struck by its train, but that he was lying down upon the same; that he had either been foully dealt with and stunned or murdered and placed upon the track, or else that he was in a state of intoxication and had walked upon appellant's track and lain down upon the same, or for some other reason was lying asleep or in a state of insensibility on the track, and that its servants in charge of said train did not discover him in time to prevent the injury; that by an ordinance of the city of Fort Worth it is provided in substance that it shall be unlawful for any person to trespass upon the property of any corporation without its consent, and any person so doing shall be deemed guilty of a misdemeanor and upon conviction be fined any sum not exceeding ten dollars. A jury trial resulted in a verdict and judgment against appellant in the sum of $15,000, from which this appeal is prosecuted.

J. L. Matthews owned a grading outfit consisting of teams and tools and had been working for the Santa Fe Railroad near Hudenheimer up to a few days before his death. He quit work near Hudenheimer and his teams and grading outfit had been carried to Cleburne, Texas. On the afternoon of May 7, 1899, the day before he was killed, he left Cleburne for Fort Worth, in company with T. W. Turner, expecting to get work either at a gravel pit in the city or from the Texas and Pacific Railway Company. Before leaving Cleburne, Matthews instructed one of his employes to carry the grading outfit across the country to Fort Worth, and meet him at a certain watering trough on Main Street about 3 o'clock p. m. on May 8. About 10 o'clock p. m. on May 7, Matthews and Turner separated at a hotel or lodging house on Main Street, agreeing to meet next morning at 7 o'clock on Front Street and then go together to look for a camping place for the teams and grading outfit. Matthews told the clerk at this lodging house that he wanted to secure a bed, but did not care to go to sleep right then; that he was going away, but would be back in about one hour to occupy the bed. He was informed that he could get the bed, and about 10 o'clock p. m. he left in a state of intoxication, but did not return to occupy the bed.

L. C. Andrews testified: My name is L. C. Andrews; age 43 years; I reside in Fort Worth; am a cooper by occupation or trade. At the present time I am in the employ of Armour & Company of north Fort Worth. On May 8, 1899, I resided in Fort Worth Texas, and was

employed as night clerk at the Tremont Hotel, on Rusk Street, just east of the courthouse. I am not acquainted with the plaintiffs or any of them. Never saw them that I know of. I did hear of the circumstances of the finding of the body of a dead man on the track of the defendant railway company near the old cemetery, in the city of Fort Worth, on or about the 8th day of May, 1899. I don't remember the date, but remember that it was along about that time. I heard of the matter through hearing people talk about it at the time. I met and got slightly acquainted with a man who, I believe, was J. L. Matthews on the night previous to the morning J. L. Matthews, deceased, was found dead on the Santa Fe Railroad out near the old cemetery. I met him about 11 p. m. in the office of the Tremont Hotel, in Fort Worth, Texas. This man Matthews came into the hotel office and applied for a bed for the night. I let him have the bed, received payment from him for the bed for the night and showed him his room. He occupied the bed that night. I know it was the night just preceding the morning on which the dead body of J. L. Matthews, deceased, was found on the Santa Fe track out near the old cemetery. My only transaction with him was renting him a bed for that night and receiving payment for it. He came in and asked me for a bed. We got into a short conversation after he had secured the bed. He told me that he had some teams on the road to Fort Worth, and that he wanted to find some suitable grounds for a camp. He asked me where he could find some suitable grounds for a camp, and I told him I was not much acquainted with such as that, but I had seen people camped on the north side of the river back of the jail, and also out along the Santa Fe track beyond the old cemetery. We had just a short conversation. I don't remember our exact words, but they were substantially as above. I know he wanted a place for his teams to camp, and I informed him of the two places where I had seen campers. Before going to bed on the night before he told me to wake him up about 5 o'clock, that he wanted to get out and get a camp for his teams. I woke him up about 5:30 in the morning. I knocked at his door and awakened him. A few minutes after he came down stairs and entered the office. It was necessary for him to come through the office coming down from his room. I did have a short conversation with him that morning. He remained in the office a very short time. He again asked me about the camping grounds and the directions to them. I gave him the directions to the places I had informed him about. He left, saying he was going to look out for a camping place. I never saw him after he left the office, I never noticed what direction he went after leaving the hotel office. The last time I saw him was in the office as he was leaving, and it was about ten or fifteen minutes before 6 o'clock in the morning. It was daytime. I never saw him, dead or alive, after that. I can not give a minute description of him. As I remember him, he was about five feet six or seven inches high, and would weigh about 135 or 140 pounds; had a light complexion; had on a brown or dark suit of clothes and a black slouch hat; I don't remember whether or not he was clean shaven or the color of his eyes. I only saw Matthews the two times, first at night, when I rented him the bed, and next in the morning, after he got up and

came down to the office. I saw him only a short time on each of these occasions. The first time I saw him, when he came for the bed, he was drinking, but he. was at himself. He could get along by himself. When he came down the next morning he was sober. The hotel at which I was working the night that Matthews was killed did keep a register. I did not enter Matthews' name on it. I saw he was drinking and never required him to register. He paid me cash for his bed. I afterwards inquired for his name and got it, but neglected to place it on the register.

W. C. Prince was sexton of the old cemetery near where the dead body of Matthews was found. On the morning Matthews was killed Prince saw one of appellant's trains pass going north. About five or ten minutes before this train passed he (Prince) saw two men walking on the railroad track, both going north. He was about thirty-five yards distant from them and did not know who they were. They passed along on the track about sixty or seventy yards apart. Prince was then on his way to the cemetery, and in a few minutes after this train passed he saw several persons gathered at the scene of the accident and went there and saw the dead body.

Clyde Baptist was a section hand in the employ of appellant and lived at its section house. This section house was about fifty feet west of appellant's track at Peach Street, which is about (¼) one-fourth of a mile south of where the dead body of Matthews was found. On the morning the body was found he saw a man walking up appellant's railroad track north. He did not know the man. The man he saw was about five feet and six inches high, medium built, and wore a dark suit of clothes and slouch hat, probably of a brown color. About five minutes after this man passed up the track a stock train of appellant passed going north, running about twenty-five or thirty miles per hour. The man Baptist saw, who had just preceded the train up the track, was walking very brisk when he passed the section house, a little over an ordinary walk and about like a business man would go to and from his business. This witness on the same morning found one-half of a vest about one mile from the point where the dead body was found. This piece of goods or vest was of the same quality of goods, in the witness' judgment, as the clothes the man wore who passed the section house going north on the appellant's track. This piece of a vest had not been cut, but torn from the other part of the garment. Baptist did not know whether the dead body found was the same man he saw pass the section house or not. When Matthews left home some months before the accident he carried with him two hats, one a black and the other a drab. He also took with him a dark brown coat and vest and a lighter colored brown pair of pants. After his death the black hat was returned to his wife, but the coat, vest, pants and drab hat were not.

"There were about three miles of appellant's railroad lying within the corporate limits of the city of Fort Worth, its general direction being north and south. Situated within the city limits about one mile and a half north of the depot and on the west side of the road is what is known as old cemetery. Beginning near Peach Street, which is about one-fourth of a mile south of the point where the dead body was

found, and extending north to the Trinity River, about a mile, the railroad is built upon an embankment varying in height, but a good portion of it is probably 15 feet high. Just north and near old cemetery were grounds that had been used for campers for many years, and the stockyards are about three miles north of the city.

"H. E. Bemis, for defendant, testified: 'I am a locomotive engineer; have been for 24 years; I am in the employ of the G. C. & S. F. Ry. Co., and have been for 16 years. I know about a man having been run over about May 8, 1899, in the northern part of Fort Worth, near the old cemetery; that is what was told to me afterwards was the body. I heard there was a body run over. On that morning I was running an engine on a train. We left the Fort Worth station at 6 o'clock. I know where the old cemetery is in the city of Fort Worth; I remember passing it that morning. The railroad runs right close to it; some of the embankments are walled up to keep from sliding into the cemetery. That morning was very foggy. As near as I can recollect we were making about twenty-five miles an hour when we passed the old cemetery that morning. I did not time myself, just judging it, the speed and grade and things like that. It is a down grade there towards the Trinity River. After leaving Peach Street there are no more surface crossings before you get out of town. As we went along by the old cemetery my attention was attracted to something on the track. It was a dark object, and going at that rate of speed, it being so vague and all considered, I could not distinctly tell what it was, whether it was a pile of rocks or what it might be. I thought it might be a hog, or a dog, or something like that, I could not tell. It was not a great distance ahead of the engine, only a short distance; I would not think it was more than thirty or fifty feet, something like that, I could not tell. You could form a pretty good idea, knowing the condition of the weather and the speed of the train. I could not say how far it might have been ahead; I should say a car length in front of the engine, which is from thirty to forty feet. About twenty-five or thirty feet is the engine's length; I have not the exact dimensions; that is my best judgment. I know the fireman noticed that object by his asking the question 'what is that?' that is how I know he did. He made the exclamation, 'what is that?' is about all I remember was said between me and the fireman about the time we went over that object; I do not remember what else was said in that conversation, it has been too long ago. Our first meeting point was the stockyards. The other train had the right to come out on the main line and come to Fort Worth against us after that; they had orders to wait until 6:15 for us. We met another train that morning at the stockyards. I did not see any man that morning walking along the track in front of the engine, and did not strike any man walking along in front of my engine. As we went along the track that morning I was watching the track closely. When it is foggy, if anything, it is more necessary to keep a constant lookout. The headlight of my engine was burning. In a fog the headlight of an engine is of no aid to the engineer, the idea is that it aids one in a fog to see the engine. Going at the rate of speed we were at the time we hit the object on the track I could

not have checked my train by the use of the appliances at hand, in time to prevent running over that body.'

"A. R. Woodward, for defendant, testified: 'I reside at Cleburne; I am a locomotive engineer; I was a fireman before my promotion in 1901; I remember the circumstances of a man being run over alongside of the old cemetery, in the northern part of Fort Worth, some time in May, 1899. I was on an engine running from Fort Worth that morning. H. E. Bemis was my engineer. I am familiar with the track; I know where the old cemetery is, the cemetery borders on the right of way. My train passed there about 6 o'clock in the morning. It was very foggy and, if I remember, misting rain some. About the time we passed Peach Street there was a signal given for the curve— both bell and whistle. I don't know just how long the bell continued to ring as we passed the old cemetery, but some distance down the road. The signal was given somewhere near Peach Street, both by bell and whistle; the whistle signal is two long blasts and two short blasts for every road crossing or curve. The fireman rings the bell; I was ringing the bell on that morning. As we passed along the track by the old cemetery that morning I saw an object on the track. As we were going down the hill I was sitting on the seat box and looking ahead, and this object appeared on the track and looked very unusual and uncommon, and I looked closer at it. I don't suppose I seen the object over sixty, seventy or eighty feet ahead of the engine. We passed over it quickly, and as we passed over it, I glanced over at the engineer and says: "What is that?" He says: "That's what I want to know." That is about all there was to it. There was a general conversation to the stockyards. The engineer spoke up very soon and says: "I believe it looked like a human form." I says, "That's what it looks like to me."'

"John Woods, a negro, had spent the night at his mother's, who lived near the appellant's railroad, and about 200 yards north of where the dead body was found. He was walking down the track southward on the morning Matthews was killed, going to the city of Fort Worth. He met a freight train loaded with cattle on the railroad track going north. He heard no signal of the approaching train, either by ringing of the bell or sounding of the whistle, and the train was within about thirty or forty feet of him when he discovered it. He saw and heard it about the same time. He stepped aside to let the train pass, but it was running so fast and so near to him before he discovered it that he narrowly escaped being struck by it. After the train passed, Woods got back on the track and proceeded on towards the city, and when about one hundred yards south of the point where the train passed him he discovered the body of a dead man lying on the railroad track. This body was badly mangled and almost nude, nearly all the clothing having been torn from it, but was warm when found and blood flowing from it freely.

"It was admitted on the trial that the body found by John Woods and viewed by the other witnesses, was that of J. L. Matthews, and that the point where Matthews was killed was within the corporate limits of the city of Fort Worth. The morning Matthews was killed there was a very dense fog.

"By an ordinance of the city of Fort Worth, it was made a misdemeanor for any person to trespass upon the premises of another or corporation without his or its consent; and it was also made a penal offense by an ordinance of that city to run a train anywhere within the city limits at a greater rate of speed than six miles per hour.

"Appellant had also promulgated a rule as follows: 'All trains will reduce speed to six miles per hour through the corporate limits of Fort Worth.' Endorsed on the time card containing this rule was the following: 'For the information and government of employes only. The company reserves the right to vary from it at pleasure.' It was admitted that this rule was in force at the time of the accident.

"Appellant's railroad track north of Peach Street and alongside of the old cemetery and where J. L. Matthews was run over by appellant's train and killed, was commonly and habitually used by a great number of pedestrians, at the time of the accident, as a footpath, and had been so used for many years prior thereto. This track had been used so constantly as a footpath and by such a large number of people and for so long a time that we conclude that appellant's agents and servants located at Fort Worth and those operating its trains over said track had full knowledge of such use.

"M. R. Pendell, for defendant, testified: 'I was superintendent of the northern division of the Santa Fe in May, 1899. My duties as superintendent took me all over the line. I had full charge of the track north of Fort Worth between the station and the Fort Worth stockyards. We were making some improvements along there at that time. I used to go there sometimes two, three and four times a week, sometimes over it several times. Was division superintendent three years and a half; and was trainmaster three years and a half before that time. There was no foot path along that track. Like any other track, occasionally saw people on it. We had workmen along there. There were few people along there. I had full control of the track along there by the cemetery. There was no one, not even myself, had any authority to give permission to citizens and outsiders to use tracks as a highway. The general manager or general superintendent at Galveston did have this authority. Colonel Polk was then general manager and B. F. Yoakum was general manager prior to Colonel Polk. If any authority had been given to any person for footway or use of the track it would have gone through my hands, through my office; it would have come under my jurisdiction.

"L. J. Polk testified: 'I am forty-six years of age; residence Galveston, Texas. My occupation is that of general manager of the Gulf, Colorado & Santa Fe Railway Company, and my residence and occupation were the same in May, 1899. The company caused notice to be printed and posted at all depots, warehouses and other numerous places on the company's property, and, as far as practicable, the notice has been kept posted ever since that time. I did not know that the portion of the defendant's track in question has been, and was for a long time prior to May 8, 1899, used by the public as a footway. I have not been so informed. I have no personal knowledge as to what extent the track of the company has been used at Fort Worth.'

"Appellant had posted on the north and south ends and on the sides of its depot at Fort Worth, in conspicuous places, notices warning the public and positively forbidding them 'to enter, sit, stand or walk upon its railroad, sidetracks, right of way,' etc.   This depot was situated one mile and a half south of the point where J. L. Matthews was run over and killed.   There is slight evidence tending to show that there may have been a notice at Peach Street, which is about one-fourth of a mile south of where the accident occurred, but we think the verdict of the jury embraces a finding that there was none there, and we find there was no such warning notice nearer than one mile and a half of the point where Matthews was run over by the train.   There was no express consent on the part of the appellant or its agents for pedestrians to use that portion of its railroad track in question, as a footpath.   We also think the verdict of the jury embraces a finding that at the time J. L. Matthews was struck by appellant's train he was walking along on appellant's railroad track and was not lying down upon the track, and in deference to the verdict we so find.

"Appellant offered by L. J. Polk, its general manager, to prove that appellant had never consented to the use, by the public or any person or persons, except on business of the company, of the appellant's right of way, depot grounds or reservation, as a pathway.   Appellee's counsel objected to the introduction of this testimony on the ground 'that it stated an opinion and conclusion of the witness and involved not only a question of fact but a question of law as well and that it invaded the province of the jury, being a statement of the very question which the jury was to decide.'   The objection was sustained and the testimony excluded.

"When the dead body of Matthews was discovered it was almost nude, nearly all the clothing having been torn from it.   The witness, Prince, in testifying did not describe the size, form or clothing of either of the men he saw going north on appellant's railroad track just a few minutes before the train passed and Matthews' dead body was found.   Nor did he or any other witness describe what there was of clothing on Matthews' body.   The trial court permitted the witness, Prince, to testify, over appellant's objection, that such testimony was 'an opinion and conclusion of the witness on a matter that was for the jury and that it was incompetent, irrelevant and immaterial, as follows: 'I have not undertaken to say that I believed that one of the men walking on the track was the man that was killed.   It is my opinion that such is a fact from the resemblance of the dead man in form and clothes to the second man I saw going along the track.'

"Upon the issue of contributory negligence the court charged the jury as follows: 'You are further instructed that if you find and believe from the evidence that J. L. Matthews was walking along the defendant's track and was struck and killed by said train, but if you further believe from the evidence that in going upon said track to walk along same at the time and under the circumstances he did, if you find he was so walking, said Matthews was guilty of negligence, as this term has been defined to you, or if you believe that said Matthews was at the time in a state of intoxication, and that such state of intoxication placed him in such a condition that he was unable and

failed to exercise ordinary care for his own safety, as ordinary care has been heretofore defined to you, and that by reason of such condition he was struck and killed by said train if you find he was so struck and killed; or if you believe from the evidence that said Matthews could, by the exercise of ordinary care, have seen or heard said train in time to have gotten out of the way of it and avoided injury; and if you further believe from the evidence that he failed to look and listen, or to do either for an approaching train, and that in such failure, if you find he did so fail, you find and believe said Matthews was guilty of negligence, as this term has heretofore been defined and explained to you; and you further believe that said negligence, if any, proximately contributed to his death; or if you believe from the evidence that there was sufficient space for said Matthews to have walked along the embankment of defendant's roadbed outside of the railway tracks without danger of being struck by a passing train; and if you further believe from the evidence that when he was struck by said train, if you find he was struck by said train, he was walking between the rails on defendant's roadbed, and if you further find and believe that in walking between said rails, if you find he was so walking, said Matthews was guilty of negligence, as this term has been defined to you, then in either of the events mentioned in this paragraph, you will find for the defendant, although you may believe that the defendant was negligent in any or all of the particulars submitted to you by the court.'

"Question 1. Did the trial court err in submitting to the jury the question whether or not the deceased, J. L. Matthews, was guilty of contributory negligence in being upon appellant's railroad tracks at the time and place of the injury? In other words, under the facts stated, was the said Matthews guilty of contributory negligence as a matter of law in being upon appellant's railroad track at the time and place when run over and killed and should the jury have been instructed to return a verdict in favor of defendant?

"Question 2. Under the facts and evidence stated was the said J. L. Matthews, at the time he was run over, a licensee upon appellant's railroad track?

"Question 3. Did the court err in permitting the witness, Prince, over appellant's objections, to testify: 'I have not undertaken to say that I believed that one of the men I saw walking on the track was the man that was killed. It is my opinion that such is a fact from the resemblance of the dead man in form and clothes to the second man I saw going along the track?

"Question 4. Did the trial court err in excluding the testimony of appellant's general manager, L. J. Polk, that appellant had never consented to the use by the public or any person or persons, except on business of the company, of appellant's right of way, track, depot grounds or reservation, as a pathway?"

We answer the first question, that the facts do not show that, as a matter of law, Matthews was guilty of contributory negligence in walking upon the defendant's roadbed, therefore the trial court did not err in submitting that issue to the jury.

To the second question we reply, under the facts found by the Court of Civil Appeals the jury might have concluded that Matthews was a licensee as defined by the decisions of this court. Washington v. Missouri, K. & T. Ry. Co., 90 Texas, 314; Lee v. International & G. N. Ry. Co., 89 Texas, 583; Texas & P. Ry. Co. v. Watkins, 88 Texas, 25; St. Louis & Texas Ry. Co. v. Crosnoe, 72 Texas, 79.

It is well settled by the decisions of this court and by the decisions of courts of other states, that if a portion of the roadbed of a railroad company has been commonly and habitually used for a long time by the public as a footpath, with the knowledge and acquiescence, or by the permission of the company, it is considered as having licensed the public to use such portion of its roadbed for that purpose. The evidence in this case would justify a jury in finding that the railroad company had knowingly permitted the public to use its roadbed at the place of the accident for a number of years, and, under such facts, Matthews would be considered as a licensee; that is, he would not be held to be trespasser in the sense that his act of walking upon the roadbed would, per se, constitute negligence that would defeat a recovery for his death by his wife and children.

We answer the third and fourth questions in the negative.