John HAUGHTON et al., Appellants,

v.

HOUSTON BELT & TERMINAL RAILWAY
COMPANY, Incorporated, Appellee.

No. 13261.

Court of Civil Appeals of Texas.
Houston.
Oct. 16, 1958.

Musick, Musick & Heath, Robert H. Heath, Houston, for appellants.

Fulbright, Crooker, Freeman, Bates & Jaworski, Quentin Bates, Houston, for appellee.

WOODRUFF, Justice.

This action was instituted by appellants, John Haughton, the surviving husband, and Alexander Minor, an adult dependent son, of Annie Coachman Haughton, deceased, to recover damages for the negligent killing of Annie Haughton on the night of May 8, 1954, by appellee's employees in running over her in the operation of its equipment. At the conclusion of appellants' testimony the trial court sustained appellee's motion to instruct a verdict in its behalf because appellants had failed to prove any negligence on the part of appellee's employees proximately causing Annie Haughton's death and because the proof showed that the deceased Annie Haughton was guilty of contributory negligence as a matter of law.

Judgment being entered accordingly appellants duly excepted and perfected their appeal to this Court.

The two points of error upon which appellants rely are that the trial court erred in directing a verdict against them because

"(1) They had pled and proved a prima facie case of negligence on the part of appellee and its employees which proximately caused Annie Haughton's death; and,

"(2) The proof did not establish contributory negligence on the part of Annie Haughton as a matter of law."

By a counter-point appellee contends that the trial court correctly instructed the verdict in its favor because there was no proof of any negligence on the part of appellee or its employees proximately causing Annie Haughton's death.

The testimony showed that appellant, John Haughton, and Annie Haughton were married in 1927 and that she died as the result of the injuries she received by appellee's switch engine running over her about 10:30 p.m. on May 8, 1954, while she was crossing the railroad tracks running in a northerly and southerly direction located east of the Port City Stockyards and near which was located a water tank.

Appellants alleged that for many years there had been a foot path across appellee's tracks where Annie Haughton was run over; that the deceased was a licensee upon its premises; and that "while using said bridge and pathway over said tracks * * she fell to the ground and was injured and was unable to arise completely though in her efforts to gain her feet and safety." she would partially rise and fall back, and while thus engaged, she was struck by defendant's locomotive, run over and dragged some 15 feet, thus sustaining injuries from which she died.

The pertinent allegations of negligence proximately causing Annie Haughton's death, with which appellants charge appellee's agents were:

"(a) In running forward while pushing a car that blocked the headlight of the engine so that there was nothing visible from the use*d* of said headlight same being ineffective as though there were no headlight at all;

"(b) In not keeping a proper lookout for pedestrians crossing and being on its right of way and on its tracks;

"(d) In running and operating said train engine and freight car at a high

rate of speed and in not using ordinary care to slow the speed of said train engine, after its operatives saw, or should have seen said decedent, Annie Haughton, on the track, and right of way and realized *their* perilous condition, and from which *they* failed to extricate *themselves;*

"(e) In not using ordinary care, under the circumstances, to have said train under such control so that it could, after its operatives saw or should have seen said decedent, Annie Haughton, on the track, have slowed or stopped said train to avoid killing her after realizing the perilous condition of said Annie Haughton from which *they* did not extricate *themselves;* and

"(f) For operating and running said engine without a headlight, or with a headlight rendered useless, by obscuring and shielding said headlight so that they could not see far enough ahead to properly control the train at the speed they were traveling."

Appellee's answer consisted of a general denial, a plea of contributory negligence, and the affirmative defense of unavoidable accident.

■ Inasmuch as the trial court instructed the verdict against appellants, we must review the evidence offered by them and determine its sufficiency according to established rules. The applicable rule is that the quantum of proof required of a litigant on its fact issues to entitle him to a submission to a jury is the introduction of such facts and circumstances as taken together with all reasonable inferences therefrom to constitute some evidence of probative force of their existence. Ford v. Panhandle & S. F. Ry. Co., 151 Tex. 538, 252 S.W.2d 561; White v. White, 141 Tex. 328, 172 S.W.2d 295.

■ In determining whether the appellants in this case have discharged this burden, we must view and interpret the evidence in the record in its most favorable light to the appellants, disregarding all evidence and the inferences therefrom favorable to the appellee. Ford v. Panhandle & S. F. Ry. Co., supra; Cartwright v. Canode, 106 Tex. 502, 171 S.W. 696; Smith v. Consolidated Cas. Ins. Co., Tex. Civ.App., 290 S.W.2d 589–591, writ ref., n. r. e.; Najera v. Great Atlantic & Pacific Tea Co., 146 Tex. 367, 207 S.W.2d 365; Fitz-Gerald v. Hull, 150 Tex. 39, 237 S.W.2d 256.

■ We pass now to a discussion of the evidence. There can be no question concerning the adequacy of the proof to establish the fact that Annie Haughton was a licensee in the use of the path across the tracks. Appellant Haughton testified that twenty years before Annie was killed he had built his home and five rent houses across the tracks from Port City Stockyards and that about 1932, with permission from Mr. Cooper, "a man from the railroad company," he built a foot-bridge of twelve ties across the ditch near the water tank on the west side close to the stockyards and thereafter he placed a small bridge on the east side of the tracks. Seven witnesses, including appellants, testified to their having lived or visited east of the tracks and to their use and the use by many others, during the day and night, of the bridges and the path across appellee's track over a period of many years in going to and returning from various places to the west of the tracks, including getting water from the tower. There was also testimony that such use of the pathway had been made without complaint or admonition from appellee or its employees. This evidence, in our opinion, was amply sufficient to raise the issue that Annie Haughton was a licensee while using the walkway across the tracks on the occasion in question. Gulf, C. & S. F. R. Co. v. Matthews, 99 Tex. 160, 88 S.W. 192, 197; Gulf, C. & S. F. R. Co. v. Cohen, Tex.Civ.App., 126 S.W. 916; Texas & N. O. R. Co. v. Howell, Tex.Civ. App., 176 S.W.2d 787; 35 Tex.Jur., p. 951, Sec. 386.

Appellee, in its brief, has raised the question of the sufficiency of some of appellants' allegations of negligence. Possibly more care and accuracy could have been used in drafting them. However, no special exception appears to have been filed raising this contention in the trial court. The rule is that in construing a plaintiff's pleading in the absence of special exceptions all reasonable intendments will be resolved in their favor. Hanley v. Oil Capital Broadcasting Ass'n, 141 Tex. 243, 171 S.W.2d 864; 33 Tex.Jur., pp. 628–629; M System Stores v. Davenport, Tex.Civ. App., 36 S.W.2d 243, writ dism.

We are of the opinion that the foregoing allegations were sufficient, if supported by the evidence to require the submission of the following special issues of negligence on the part of the appellee and its operatives, in the following particulars:

"(b) In failing to keep a proper lookout for pedestrians, including Annie Haughton, crossing and being on its right of way and tracks at the place in question;

"(d) In operating the engine and freight car at a high and excessive rate of speed under the circumstances; and

"(e) In failing to have the train under such control that after its operatives saw, or, in the exercise of ordinary care, they should have seen, the decedent upon the track, they could have slowed or stopped the train in time to have avoided killing her."

We now come to a consideration of the sufficiency of the proof to establish negligence on the part of the appellee and its employees. Sol Wright, who had lived across the tracks for about 15 years, testified that on the night of May 8, 1954, between 10 and 11 p. m. Annie Haughton, Joe Campbell, and Alexander Minor (Annie's son), who were riding in a taxi on Calhoun Street, picked him up and brought him to the stockyards near the tracks. He said that he had not drunk anything that evening and neither had Annie nor Alexander, although Joe Campbell "may have had a couple of beers."

Annie Haughton got out first, so he said, and started home. Some 15 or 20 minutes later he started across the tracks and saw a brakeman shining a light under a switch engine, and Annie was under it. With reference to lights in the area, he said there were none except "them little old dim lights from the stockyards." He said that the engine was backing up and "coming back to town towing a work car", that the light was on the back of the switch engine. It was a "little bitty switch engine." He said "they don't switch there; they switch around the station", which the testimony showed was some distance to the south. He did not hear a whistle blow but he heard "the locomotive slam the brakes on * * *. When he put the brakes on I heard them screech;" and "I walked kind of fast to get around there." He also stated that the engine was blocking the path when it stopped.

Mildred Yancy testified she had known Annie Haughton for about 16 years; that Annie had done housework for her for a number of years. About a year before she was killed Annie hurt her knee and was never strong thereafter. On occasions she had stumbled and fallen; that two weeks before she was killed she had fallen and a dog had "chewed her leg up." She said Annie did not drink.

Appellant, Alexander Minor, the deceased's adult son, testified that about 8 o'clock that evening he, Annie and Joe Campbell, had gone to a tea room where they drank soda water, laughed and talked until about 10 o'clock. He did not see his mother drink anything but soda water although he drank two cans of beer. Enroute home in a cab they picked up Sol Wright. They got out near the Port City Stockyards. He did not know what the others

did but he left them, "coming on * * * to open up the house and have it lit up." However, the train was coming and he "had to break and run off the track." Explaining, he testified that the first time he saw the train it was "right at" him and picking up speed. At that time he was "right at the edge of the track, fixing to come down a little hill—a little ramp to get·off the track." It was the "back of the track" toward their property. When the train speeded up, he "broke and run" and "when I run, I looks back over my shoulder just as the train got up there where I had just got off." He did not hear anything but saw "something waving —looked like it was waving—was flagging the train or something." That was his mother. He did not think she made any noise. He "passed out" during the time he was getting off the track. He did not remember hearing the noise of the brakes. The next thing he remembered was the next day when Etta Mae Rawls came to his house. He had had one of those "athletic spells." The engine was making "a little noise as usual" but he heard no whistle, no bell ringing. Asked if it was the back or front end of the train which he saw, he said, "Well, it wasn't too much light and it was the back end of the train pushing the car back." He did not see much of the engine light "because it was shining against the coach *he* was pushing." When asked if he had any idea how fast the engine was going, he said, "No, sir. But he had a pretty good speed. It looked like it was making about 10 miles per hour" when he first saw it, but when he looked again it looked "like it had speeded up to about 50 miles per hour." It was about as far away "as from here across the street over there." He did not stay on the·track but began "to run down the hill of the track." He did not recognize who was waving their arms. He did not see any headlight shining down the tracks. He remembered everything clearly up until he "blacked out." The closest the train got to him before he ran off the track was

"about as far as from here across the street over there * * * about half a block." Regarding how far he was "down away from the tracks" when he turned back and looked, he said he was "right there at the foot of the hill, right at the track," which he would say was "this little distance from here to that wall right behind you."

When asked what made him notice the engine and coach first, he said he heard the "brake sounds" when it crossed the bridge over Bray's Bayou, which was "a good little distance * * * about half a block" from where he made this crossing. He saw no lights on the engine or car until he looked back and "seen the lights spray against the coach." The coach was between him and the engine. After his mother was killed, he did not go back and look; he ran off the hill "over there in the weeds somewhere and passed out."

He said he did not know anything about going to the police station with Officer Foltz that night and making or signing a statement. He did not believe he made a statement. He was "out" and "did not know nothing" until the next day. He did not know what side of the tracks Joe Campbell was on or where he was when Annie was hit. He denied telling the officers that all of them had been drinking and that Joe Campbell ran across the tracks, then he ran across, and his mother then started across and fell. He stated he did not see his mother fall. The last time he saw her was in the cab about 60 feet from the tracks as he was "going on," nor did he see his mother standing up waving some kind of a signal, but as he went down off the track it "looked like I seen somebody waving their hand something like that (indicating)." He saw somebody waving but he did not know who.

Upon being asked if it was not true that when he first started to cross the tracks, the train was about a half block down there, going about 10 miles per hour,

he said, "I heard *him* coming along about 10 miles per hour."

He was shown a written statement purportedly signed by him. He said he did not remember giving it but his signature was "kind of like that." The statement, which was tendered by appellee, read as follows:

"May 9, 1954 12:45 a. m.

"Before me the undersigned authority this day personally appeared Alexander Minor, who is a credible person and who after having been sworn, did depose and say:

"My name is Alexander Minor. I am 52 years old. I live in a house on the east side of the H. B. & T. tracks behind the Port City Stock Yards. Annie Haughton is my mother and owns three houses at the location where I live. I am not employed.

"Last night, May 8, 1954, my mother, Annie Haughton, and her common law husband, Joe Campbell, and I went over to the Third Ward and did some drinking. We then caught a cab to the Port City Stock Yards and then started walking on home from there. Joe Campbell was first, I was second and my mother was third. When we got to the tracks I noticed a train coming. and I ran on across the tracks. Joe Campbell was in front of me and he also ran across the tracks. Annie Haughton was behind us and started across the tracks and she fell. We didn't have time to help her as the train was bearing down on her. The train ran over her and stopped on top of her.

"All of us had been drinking quite a bit before the accident.

"This is all I know about the above case. I cannot read but have had the statement read to me by D. M. Fults

and it is true and correct. I can sign my name.

"Signed: /s/ Alex Minor
Alexander Minor

"Subscribed and sworn to before me, this 9th day of May A.D., 1954.

"/s/ D. M. Fults
"D. M. Fults, Notary
Public in and for Harris County, Texas."

Alexander said the train was not on the third track. It was on the second track— the center track. Regarding that portion of the statement that Annie Haughton "fell" he said he did not see that, but explained, "I knew she must have been down * * * I seen something waving; looked like she was waving her hand." He said he saw her by the lights from the Port City Packing Plant which "shine all over up on top of the track pretty good."

Etta Mae Rawls and John Haughton testified that Alexander had become disabled because of epileptic seizures, about ten years before Annie was killed, although previously thereto he had worked at the Ship Channel for about 22 years.

Officer Harry E. Cole testified that he investigated this accident and made a report. He acknowledged having no independent recollection about the facts, but by refreshing his memory from the report he stated that he found Ann Haughton lying on the railroad track behind the Port City Stockyards with a switch engine over her. The engineer, H. C. Phillips, and fireman, J. W. Farrell, stated that they were going toward town pulling one car, and as they came to the double track junction behind Port City Stockyards they noticed this woman down on her all-fours on the track. They were right on her before they saw her and stopped as soon as possible, and they dragged her possibly 25 feet.

They did not say how far away they were from her when they first noticed her.

He stated, too, that they talked to two men by the names of Campbell and Alex Minor, and learned that the injured woman, her son Alex Minor, and her common-law husband, Joe Campbell, after getting out of a cab in the vicinity of the Port City Stockyards, were walking single-file and when they came to the tracks the train was coming and the two men, who were in front, ran across the tracks and that Ann Haughton fell on the track and the train ran over her before the two men could help her.

He stated, too, the engine was north of the car. He remembered some illumination coming from the reflection of the lights in the neighborhood of the stockyards, but he and Mr. Foltz, a fellow officer, used their flashlights after getting out of their car near the stockyards and in locating something upon which they walked across the ditch, and in finding a path going up the side of the railroad tracks which they used in getting to the scene of the accident. He said, too, they had to cross one set of the tracks.

Officer D. M. Foltz testified that he was with Captain Cole when the investigation was made. When they arrived the engine was still over the injured woman. In getting to the scene they had to cross a ditch near Port City Stockyards and several railroad tracks. They used their flashlights to get there. He talked to the engineer and fireman and they stated that they were going toward town, pulling one car, and after they came to a double track junction at Port City Stockyards they noticed Ann Haughton on her all-fours on the track. They were right on her before they saw her and stopped as soon as possible. They dragged her body approximately 15 feet.

Officer Foltz testified that Alexander Minor and Joe Campbell were taken to the police station and there he took a statement from Alexander at about 12:45 a. m. Minor told him he could not read and Officer Foltz read it over to him after it was written. Mr. Foltz identified the statement which had been offered in evidence, and said that the information contained therein was given to him by Alexander Minor and he had had him swear to it before it was signed.

Adhering to the rules heretofore set forth requiring that the testimony be viewed in its light most favorable to appellants, we believe that the evidence was sufficient to support the conclusion, if reached by a jury, that Joe Campbell was the first to start down the path to cross the tracks; that he was followed by Alexander Minor; that Annie fell in behind Alexander but far enough away that he was not aware that she was following him; that they were proceeding single file on the path that crossed the tracks, and when Alexander reached the tracks he heard the sound of brakes on an engine as it crossed the Bray's Bayou trestle about half a block away. However, noticing no light he continued walking, and Annie followed. When he reached some point between the second and third tracks or possibly as far as the third track he saw the train coming with a dim light on it. He started running. Apparently Campbell was still ahead of Alexander and from the circumstances as hereinafter enumerated Annie, so it could have been concluded from the facts, was engaged in crossing the middle set of tracks at this moment. She too was startled by the approach of the train which, according to the testimony of both Alex and Sol, had neither sounded a whistle nor rung a bell although it was approaching the foot-path where the operatives were under the duty to anticipate the presence of persons crossing the tracks. Instinctively she hurried to clear the track but in her haste she either stumbled or her knee gave way and she fell between the rails. Meanwhile Alex, whose attention was engaged in getting off the tracks, did not know that his mother had fallen and having reached the far shoulder of the railroad bed and when he was starting down the far bank thereof he looked over his shoulder and saw "something waving—

looked like it was waving—flagging the train or something." The engine was making a little noise but he heard no whistle or bell. Neither did he remember hearing the application of the brakes. He then ran into the weeds and had a seizure.

In this interval Annie, having fallen on the track, experienced difficulty with her knee in attempting to get up but seeing the approach of the engine at an accelerating speed, she waved her hand to attract the attention of the operatives. Still striving to rise, she then managed to get to her hands and knees. It may well be concluded under these circumstances that it was at this instant she was first noticed by the engineer and the fireman and that they were "right on her and couldn't stop before they had run over and drug her about 15 to 25 feet," although she then had been on the tracks for some appreciable time.

Appellee contends that Alex's written statement to the officers will not warrant such an interpretation of the facts. However, it was taken at the police station about two hours after the accident had occurred and to which place he had been carried by the officers. Moreover, it consisted of a narration of a series of events occurring during the course of several hours. In our opinion, it does not come within the rule to make it res gestae. Texas Interurban Ry. v. Hughes, Tex.Com. App., 53 S.W.2d 448; Dallas Ry. & Terminal Co. v. Little, Tex.Civ.App., 109 S.W.2d 289, writ dism.; City of Houston v. Quinones, 142 Tex. 282, 177 S.W.2d 259. Consequently, the statement could not be used as substantive evidence. Bradley v. Texas & P. R. Co., Tex.Com.App., 1 S.W.2d 861; Fowler v. Roden, 129 Tex. 599, 105 S.W.2d 187; McCormick and Ray on Evidence, Sec. 688. It was, however, subject to being used for impeachment purposes. This, nevertheless, is a matter that only the jury could pass on. Gulf, C. & S. F. R. Co. v. Clement, Tex.Civ.App., 220 S.W. 407, affirmed Tex.Com.App., 236 S.W. 714; Scott v. Gardner, Tex.Civ.App., 159 S.W.2d 121, error ref.

Referring briefly to the statement, it is noteworthy that it does not say that Annie noticed the train approaching, nor does it state that she ran across the tracks. According to the statement, they were walking single file, she being in the rear. It says, too, that Campbell and Alex *ran* and she *started* across the tracks and fell. We know that she fell on the second track. Moreover, the statement is silent as to when Joe and Alexander discovered she had fallen or where they were when they made the discovery. Both of these factors would have a material bearing on the length of time which would have been required for them to have rendered her any assistance, starting from the instant she fell including their discovery of that fact; their return to the second set of tracks where she fell; and until they could have helped her to her feet or dragged her off the tracks.

Be that as it may, in relating their discovery of Annie upon the tracks, the fireman and engineer said that she was on her all-fours when they "noticed" her. They said nothing about seeing any figures moving across the tracks or seeing her run upon or fall upon the tracks or seeing her in any position other than being on her all-fours. Under any version, her presence upon the track was attended by considerable movement on her part which was of such nature as would have been normally seen by anyone maintaining a lookout from the switch engine. However, they stated they were "right on her before they saw her."

Moreover, Alexander testified that between the time he first saw the train approaching and when he looked over his shoulder before running down the hill it had "picked up speed; looked like" from 10 to 50 miles per hour. He said, too, that he never heard the application of the brakes before he ran down the hill. This, if true, supports the conclusion that the fireman and engineer had not seen Annie upon the track until after that instant although she had then been there an appreciable time,

and this accounts for the fact that they were "right on her" before they saw her, thus squarely raising the issue that they were negligent in failing to keep a proper lookout and in operating the train at an excessive rate of speed under the circumstances, and that each was a proximate cause of Annie's death.

Appellee emphasizes some of the language appearing in the opinion of Gulf, C. & S. F. R. Co. v. Russell, Tex.Com.App., 125 Tex. 443, 82 S.W.2d 948, 953, to support its contention that the appellants in the instant case did not show any negligence on the part of the appellee's engineer and fireman proximately causing Annie Haughton's death. In order to properly assay the holding in that case, the singular facts there involved should be kept in mind. There a trespasser sued the railroad company for the loss of his hand which was run over by its train while only his fingers rested upon a rail with the remainder of his body lying completely outside the track and at a place not customarily used by people for travel. In accounting for his position the defendant in error testified that he had been knocked unconscious by an unknown assailant as he was walking along the track and had fallen in substantially the same position he was in when injured, except that upon regaining consciousness shortly before the train reached him he had managed to push his arms and shoulders from across the rail, but his fingers on one hand were left resting upon the rail. It was also shown that there was high grass along the side of the track and that a cattle guard was located between the engine and the man's body, which materially interfered with the view from the train. In holding that the proof was insufficient to raise a fact issue of the engineer's and fireman's failure to keep a proper lookout, the court said:

"In other words, it is contended that if the trainmen had been keeping a lookout they could have seen plaintiff in time to have slackened the speed of the train or prevented injury to him,

and therefore because they did not see him the jury was authorized to infer that they were not keeping a lookout. As indicated above, no such inference could be indulged unless it was shown that plaintiff occupied such a position on the track that he could have been seen by the trainmen at a time when he was still in a perilous position. It is obvious that after plaintiff's body was pushed from the rail of the track and only the fingers of his hand were touching the rail, he could not be seen and his danger realized except from a very short distance, and the proof is silent as to how far the train was away when his body was still upon the track in a position to have been seen."

The facts of that case clearly distinguish it from the case before us now. However, in this connection we point out the holding in Texas & N. O. R. Co. v. Howell, Tex.Civ.App., 176 S.W.2d 787. A "licensee" who had fallen and been rendered unconscious by striking his head, was allowed a recovery for the loss of his leg which was the only part of his body remaining on the track when the train passed, because of the negligence of its operative to keep a proper lookout proximately causing his injuries. In fairness it should be added that appellee also received favorable findings on the discovered peril issues, but the opinion expressly approved both theories of recovery.

However, in the case of Jara v. Thompson, Tex.Civ.App., 223 S.W.2d 941, 943, writ ref., we do find a fact situation which, for all practical purposes, is identical with the facts here. There suit was instituted by the next friend of a minor to recover damages for injuries sustained by the latter when he was struck by the appellee's engine. The accident occurred about 10 o'clock at night while the boy was crossing appellee's tracks at a place where persons were accustomed to crossing them. As the court in its opinion recounted the facts: he crossed the tracks going in a westerly direction. "He dropped his bread. He turned

back east to pick it up, and in some manner fell on the track. While prone on the track, he discovered the approach of the train and tried to signal to the engineer to stop, but was unsuccessful. Appellee's engineer and fireman testified that the train was moving slowly and that if they had seen the boy on the track the train could have stopped within the length of a box car."

In holding the evidence was sufficient to raise the issue that the negligence on the part of the engineer and fireman, in failing to keep a proper lookout was a proximate cause of the boy's injuries, it was said:

"With Hernandez on the track under the circumstances related by him, it was reasonable to conclude that the engineer and fireman could have discovered him in time to have stopped the train, if they had been keeping a proper lookout. The headlight of the train was burning. Accordingly, the jury's finding that their negligence in failing to keep a proper lookout was a proximate cause of appellant's injury was supported by the evidence and should not here be set aside."

The judgment of the trial court entered in appellee's favor non obstante veredicto was accordingly set aside and judgment was rendered in appellant's behalf against the appellee for the damages as found by the jury.

 Based upon the evidence as heretofore reviewed, when viewed in the light most favorable to the appellants, as well as the inferences to be drawn therefrom,—as we must, under the ruling of the trial court instructing a verdict against appellants,—we are of the opinion that the proof was sufficient to reasonably conclude therefrom that the appellee's engineer and fireman were not keeping a proper lookout and that they could have discovered her in time to have stopped if they had kept a proper lookout. Moreover, we are of the opinion that it can also be so reasonably concluded that the train under the circumstances was being operated at an excessive rate of speed which was a proximate cause of her being killed.

Appellants' second Point is that Annie Haughton was not guilty of contributory negligence, as a matter of law. We have heretofore set forth the evidence and have discussed it at length. The Point, in our opinion, is well taken and amply supported by the following authorities: Gifford v. Ft. Worth & D. C. Ry. Co., 151 Tex. 282, 249 S.W.2d 190; Texas & N. O. R. Co. v. Howell, Tex.Civ.App., 176 S.W.2d 787; Jara v. Thompson, Tex.Civ. App., 223 S.W.2d 941, writ ref. While contributory negligence as a matter of law is a conclusion sometimes compelled by the evidence, such cases are relatively few. Ordinarily this is a question of fact and becomes a matter of law only when but one reasonable conclusion can be drawn from the testimony. Texas & P. R. Co. v. Day, 145 Tex. 277, 197 S.W.2d 332.

Appellants' Points One and Two are, therefore, sustained and appellee's Counter-Points are accordingly overruled.

The judgment of the trial court is reversed and the cause is remanded.