O. GLENN GIFFORD ET AL V. FORT WORTH AND DENVER CITY RAILWAY COMPANY.

No. A-3542. Decided May 21, 1952.
Rehearing overruled June 18, 1952.
(249 S. W., 2d Series, 190.)

*Irving J. Vogel, Allen, Locke & Cramption and Perry, Jouri & Wilson,* all of Wichita Falls, for petitioner.

The Court of Civil Appeals erred in holding that under the facts as disclosed by the record the plaintiff Gifford was guilty of contributory negligence as a matter of law. Texas & Pac. Ry. Co. v. Day, 145 Texas 277, 197 S.W. 2d 332; Boaz v. White's Auto Stores, 141 Texas 366, 172 S.W. 2d 481; Najera v. Great Atlantic & Pac. Tea Co., 146 Texas 367, 207 S.W. 2d 365.

*Seth Barwise,* of Fort Worth, *Stanley C. Kirk* and *H. M. Muse,* both of Wichita Falls, for respondent.

In reply to petitioner respondent cites: Gulf C. & S.F.Ry.Co. v. Gaddis 208 S.W. 895; Texas N.O.Ry.Co. v. Burden, 146 Texas 109, 203 S.W. 2d 522; Sabine & E.T.Ry.Co. v. Dean, 76 Texas 73, 13 S.W. 45

MR. JUSTICE BREWSTER delivered the opinion of the Court.

This is a suit for damages for personal injuries filed by O. Glenn Gifford, petitioner, against Fort Worth and Denver City Railway Company, respondent. A trial court judgment for

petitioner based on the jury's answers to special issues was reversed by the Court of Civil Appeals and the cause rendered for respondent. 244 S. W. 2d 848.

The sole question for decision is whether the Court of Civil Appeals was correct in holding that petitioner was guilty of contributory negligence as a matter of law in stepping in front of the train which struck and injured him.

Petitioner and another boy started hitchhiking from Hugo, Oklahoma, to their home in California. They got to Wichita Falls one morning and stayed for some time on the highway north of the city but failed to catch a ride. They then went east several blocks and spent most of the day in and around the north end of respondent's railway yards, where the tracks are on an earthern embankment about 14 feet higher than the adjacent ground. These tracks crossed Front Street on an underpass thus permitting the uninterrupted flow of motor, pedestrian and other traffic on that street. To reach respondent's yards the boys went through this underpass and turned north paralled with the railroad tracks several hundred feet and stayed a few hours under the railroad bridge which crosses the Wichita River. Later in the afternoon they left the bridge and walked on a path along the east side of respondent's right-of-way for some distance. Then they left this path and went just off the right-of-way dump and stayed until about 10 P. M. under some trees. About dusk some passers-by told the boys they probably could catch a truck towards Amarillo by going several blocks to Scott Street, which was the street where they had tried to catch a ride early in the day. About 10 o'clock P. M. the boys got back on the east side of the right-of-way and walked back along the path they had traversed that afternoon and in the direction of the underpass. About 150 feet from the underpass they turned west across the embankment. They crossed the first of the three tracks on the embankment and as they were attempting to cross the middle track they were struck by respondent's north-bound train, which consisted of a diesel-electric switch engine and about 20 freight cars. Petitioner was seriously injured and his companion was killed.

The jury found that the place where petitioner was injured was commonly used by the public as a pathway, which fact was known by respondent or in the exercise of ordinary care could have been known to it; that petitioner was on respondent's premises as a licensee; that respondent's train crew failed to keep a proper lookout, to ring the bell, to blow the whistle and

to have the headlight on the locomotive burning; which omissions were negligence and a proximate cause of petitioner's injuries. On the defensive issues the jury found that petitioner was not negligent in failing to see or hear the train, in going upon the tracks or in not using the nearby underpass; that he did not fail to keep a proper lookout; and that his injuries did not result from an unavoidable accident.

After noting that Texas courts "set aside jury verdicts with considerable reluctance," the Court of Civil Appeals summarized its conclusions as follows: "None of them, however, do we construe as holding that one who steps immediately in front of a moving train, knowing the tracks to be in use, and takes no precaution for his own safety is not guilty of negligence as a matter of law. While we are aware that appellee says he stopped, looked and listened before going upon the tracks, we hold that the circumstances and physical facts speak louder than words and show beyond any doubt in our mind that he neither looked nor listened. Had he done so, he could not have failed to be aware of the train immediately upon him."

The only direct evidence relating to petitioner's actions just before he was struck by the train comes from his own testimony. He said that before going upon the tracks he and his companion "looked both directions to see if there were any trains on the track or lights or anything to warn us that there was a train or anything on the track." All other evidence material on the issue of contributory negligence was circumstantial, from which we think reasonable inference may be drawn either that petitioner did look and listen, as he claimed, or that he did not. This falls into two classes: (1) that which relates to whether he could have seen the train had he looked and (2) that which has to do with whether he would have heard the train had he listened.

As to whether petitioner could have seen the train had he looked, it is undisputed that the engine which struck him was black and that there were three street lights in each block of Ohio Street, which parallels the above-described embankment on the west side, and one street light near the underpass on the east side. These lights were higher than the embankment. Otherwise, on the issue of visibility the testimony is conflicting. Several witnesses testified that the moon was shining and that these street lights lighted up the embankment and the tracks where petitioner was hurt, while several swore that the street lights did not illuminate it because they shed their rays down and not

out onto the embankment. Among the latter was the sheriff who went to the scene of the accident. He swore that it was dark on the embankment; that he used his flashlight because he could not see without it; that when he "got up on top there wasn't any light at all up there from those street lights on Ohio on that dump." Two police officers patrolling the area just after the accident were called to the scene and they testified that it was "pretty dark up there" and that they used their flashlights in finding petitioner and the body of his companion.

There was evidence that the headlight on the locomotive was not burning at the time of the accident. Mrs. O'Mary, witness for petitioner, who was sitting on the front porch of her home, which faces the underpass and the embankment, saw the respondent's switch engine and cars going north just before pepitioner was struck. She said she "never noticed any light" on the switch engine; that if it had had a light on it she could have seen it; that "I cannot remember seeing any light because there wasn't any light at that time"; that she heard a scream, after which the train shortly stopped and then started back toward the point where petitioner had been struck; that soon after it began going north "it (the engine) turned on its lights and went to whistling," and that "this was the first time there was any lights on that diesel locomotive while you were sitting there looking." Fred Stimpson, a young college student, had gone to a trailer camp with a young lady friend to see her horse and was waiting in the street near Mrs. O'Mary's home for the young lady to return by way of the underpass from a horseback ride. He had been talking to Mrs. O'Mary when the accident occurred. He saw the train stop on the underpass, start backing up and then stop again a "considerable distance back from the under pass." He testified that as the train backed up it did not have a light on it "to my recollection"; that he was looking directly at it and if it had had a light on it he could have seen it; that, after seeing a man run across the street and then back, he, witness, ran up a path onto the bankment where he "found two men had been run over by the train"; that he saw "officers up there using their flash lights to search around in the weeds for the men"; that when he got up onto the track the train was stopped about 400 feet down the track; that it did not have a headlight burning then; that he then heard the train whistle several times and it had a light on it at that time. Policeman Morrow, who was one of the officers on the dump using a flashlight because it was dark, swore that after he had been up on the embankment "for a while" a light came on from the train; that the switch engine was coming down the track and they flagged it to a

stop for fear it would come down on them. Clyde Fain, who worked at a beer drive-in operated by his half-brother, Kiel Hopson, testified that some one ran in and said somebody had been hurt and that he had heard them hollering upon the tracks; that he, Fain, ran up a path that goes up on the embankment; that when he got up there it was dark and he stepped on one of the boys because "I couldn't see him"; that before the ambulance came and while he was leaning over the injured boy a light "came over us down the track there"; that it came all of a sudden because it lit up everything there where I was at"; and that it came from a train and an engine which appeared to be stopped. This testimony was substantially confiirmed by Hopson. George Carroll, one of the first to reach the place of the accident, testified it was dark after he got on the embankment; that he heard petitioner hollering but bumped into his leg; that as the ambulance stretcher arrived the lights from the switch engine came on suddenly, "it just came to us just all at once they were just turned on"; that he then looked up the track and the diesel engine was setting 50 to 75 feet to the south.

While Mrs. O'Mary and Stimpson saw the train both before and after the accident, they were below the level of the embankment looking up at the train, whereas petitioner was on the embankment on a level with the train. The witness Fair testified that when he reached the top of the embankment after the accident he could not see the train when he looked to the South.

As to whether the noise from the train was such that petitioner would have heard the train had he listened, there was testimony by members of the train crew that the noise made by the train, even with the power off, was quite audible; that the train was especially noisy when the brakes were applied or when the train started forward and when the slack in the cars was taken up or let out. On the other hand, five witnesses for petitioner testified that the switch engine and cars would move along quietly when the power was off. While respondent's engineer and another of its train crew swore that the power was not cut off until the engine was north of the scene of the accident, Stimpson and Mrs. O'Mary testified that the train was running quietly as it went north and before it reached the place of the accident.

We believe we have stated enough from the record to show that the evidence was such that reasonable minds might well differ as to whether either the street lights or the lights on the switch engine lighted the tracks on the embankment at the time

petitioner was injured, as to whether it was a light or a dark night, as to whether the train was running "quietly" when it struck petitioner.

To be consider along with the testimony summarized is the testimony of petitioner that immediately before he was struck he and his companion listened and heard nothing but "just sounds back south down the track down in the switching yard appearing to be things going on down there, I don't know just what it was"; and that they "walked up and looked both directions to see if there were any trains on the track or lights or anything to warn us that there was a train or anything on the track," that they saw no lights before they started across the tracks.

**1,2** It is neither our right nor our duty to determine which witnesses were telling the truth. Schiller v. Elick, 150 Texas 363, 240 S. W. 2d 997. Our problem is to determine whether the testimony is such that reasonable minds might differ as to whether petitioner was negligent in failing to see or hear the train or in going upon the tracks. Boaz v. White's Auto Stores, 141 Texas 366, 172 S. W. 2d, 481. We have concluded that reasonable minds might reach opposite conclusions on that issue, hence that the Court of Civil Appeals erred in holding that petitioner was guilty of contributory negligence as a matter of law. See Texas & Pacific Ry. Co. v. Day, 145 Texas 277, 197 S. W. 2d 332, and authorities there cited.

In support of its holding the Court of Civil Appeals cites Sabine & E. T. Ry. Co. v. Dean et al., 76 Texas, 73, 13 S. W. 45; Gulf C. & S. F. Ry. Co. v. Gaddis et al. (Com. App.), 208 S. W. 895, and Texas & N. O. R. Co. v. Burden, 146 Texas, 109, 203 S. W. 2d 522. It is sufficient to observe that in the Dean case it was undisputed that, although Dean could not hear the train because of noise made by a nearby sawmill, it was daytime and he could have seen the train which he walked in front of. In both the Gaddis and Burden case it was undisputed that plaintiff walked in front of the train in the face of a warning then being given him by a flagman not to do so, thereby substituting his judgment for that of the flagman.

**3** There was no assignment in the Court of Civil Appeals challenging the sufficiency of the evidence to support the jury's findings on the issues of contributory negligence. Therefore, since we have concluded that that court erred in holding that that there was no evidence to support those findings, the result

is that, as to those issues, we must reverse the judgment of the Court of Civil Appeals and affirm that of the trial court. Wisdom v. Smith, 146 Texas 420, 209 S. W. 2d 164.

4 Under the conclusion reached by the Court of Civil Appeals it was unnecessary for it to pass on respondent's point there that the verdict was excessive. But is must now be decided; so, since we have no jurisdiction to decide that question, the cause must be remanded to the Court of Civil Appeals to determine it.

Accordingly, the judgment of the Court of Civil Appeals is reversed and the cause is remanded to that court to decide the issue of excessiveness of the verdict.

Delivered May 21, 1952.

Rehearing overruled June 18, 1952.