**TEXAS & NEW ORLEANS RAILROAD CO., Appellant,**

v.

**Earl DAY, Appellee.**

**No. 3481.**

Court of Civil Appeals of Texas.

Waco.

Dec. 5, 1957.

Rehearing Denied Jan. 2, 1958.

Frank A. Woods, Franklin, Dawson & Dawson, Corsicana, Baker, Botts, Andrews & Shepherd, Houston, for appellant.

Julius C. Jacobs, Robert C. Jackson, Jr., Corsicana, for appellee.

McDONALD, Chief Justice.

This is a negligence case for property damage growing out of a train-truck collision at a railroad-street crossing in the City of Corsicana, at about 1:00 o'clock A.M., when the motor truck trailer of plaintiff was struck by defendant's southbound train. Understanding of the facts may be aided by the schematic diagram below:

Plaintiff's truck was headed west on East Collin Avenue. The accident occurred at night at 1:00 o'clock in the morning. At the site of the collision, eight sets of rail-

road tracks run diagonal to and across E. Collin Avenue. The distance from the first track to the eighth and last track is approximately 185 feet. Plaintiff's truck was struck by defendant Railroad on the fourth track (counting from the direction in which plaintiff was traveling).

Plaintiff sued defendant for damages to his truck. Trial was to a jury, which, in answer to special issues, found among other things:

1 and 2) Defendant's employees operating the train failed to keep a proper lookout, and such was a proximate cause of the collision.

3, 4 and 5) Defendant's train was running 25 miles per hour just prior to the collision; which was negligence; and a proximate cause of the collision.

16) Plaintiff's driver did not fail to keep a proper lookout for trains while he was approaching the track where the collision occurred.

18) Defendant's train was not plainly visible before plaintiff's truck reached a point 15 feet from the nearest rail of such railroad track at the point in question.

(The Trial Court gave the following instruction in connection with the foregoing issue:

"An object is plainly visible when a reasonably prudent person, situated as was plaintiff's driver and exercising ordinary care for his own safety, should have seen it.")

20) Defendant's train was not in hazardous proximity to the crossing before plaintiff's truck reached a point 15 feet from the nearest rail of such railroad track.

(The Trial Court gave the following instruction in connection with the foregoing issue:

"By the term 'in hazardous proximity', is meant such proximity that under all the surrounding facts and circumstances in evidence, the speed and nearness of the train was such that a reasonably prudent person situated as was plaintiff's driver, would have known that an attempt to proceed over the crossing ahead of the train was hazardous.")

21) Plaintiff's driver stopped within 50 feet but not less than 15 feet from the nearest rail of such railroad track.

22) After so stopping plaintiff's driver did not proceed when he could not do so with safety.

Upon the special issue verdict of the jury convicting defendant of negligence, and acquitting plaintiff's driver of contributory negligence, the Trial Court rendered judgment for plaintiff for damages to his truck.

Defendant's motion for new trial was overruled and defendant appeals on 17 points, and which present five basic contentions:

1. (Point 1) The evidence is insufficient to show negligence on the part of defendant's operatives. The evidence *conclusively* shows negligence on the part of defendant's driver.

2. (Point 2) The evidence *conclusively* shows that the collision was proximately due to negligence of defendant's driver, a) in failing to keep a proper lookout for trains, b) in failing to stop within 50-15 feet from the nearest rail of the track upon which defendant's train was traveling, c) in proceeding upon such track when he could not do so with safety.

3. (Point 3) The jury verdict is against the great weight and preponderance of the evidence.

4. (Points 4 through 15) Complain of the Trial Court's action in refusing to submit issues requested by defendant.

5. (Points 16 and 17) Complain of the Trial Court's action in admitting into evidence the Corsicana city ordinance making it unlawful for a train to travel more than 20 miles per hour; and the Trial Court's admission into evidence of a certified copy of a record of the Texas State Railroad Commission.

■ Reverting to defendant's 1st and 2nd contentions—The jury convicted defendant of negligence in failing to keep a proper lookout, and in traveling 25 miles per hour. The jury further found that such constituted a proximate cause of the collision. We think that such issues were raised, and that such findings are amply supported in the evidence.

Defendant's further contention herein is that plaintiff's driver was guilty of contributory negligence as a matter of law, in failing to keep a proper lookout for trains, *and in failing to stop 50–15 feet from the nearest rail of the track upon which defendant's train was traveling,* and in proceeding upon such track when he could not do so with safety. Defendant further contends that the evidence *conclusively* shows that the plaintiff's driver was guilty of such conduct; that such was negligence; and a proximate cause of the collision as a matter of law; and that defendant should have been granted an instructed verdict or a judgment non obstante veredicto by the Trial Court.

■ Defendant cites Vernon's Ann.Civ. St. Article 6701d, § 86, and contends that since plaintiff's driver did not stop at *the track* upon which its train was traveling, that plaintiff is guilty of contributory negligence as a matter of law.

There were eight tracks in the space of some 185 feet. The second track was some 50 feet from the first; the third some 25 feet from the second; the fourth some 18 feet from the third. Plaintiff's truck was *45* feet long. Plaintiff's driver stopped at the first track on the grade crossing, and looked both ways. No train was coming and he proceeded.

A review of what duties Article 6701d, § 86, imposes is deemed appropriate at this point.

Our Supreme Court, in Missouri-Kansas-Texas Ry. Co. v. McFerrin, Tex., 291 S.W. 2d 931, 935, in its analysis of Article 6701d, § 86, points out that the duty of a motorist to stop 50–15 feet of a railroad track *is not absolute, but is conditional,* as is the duty of the motorist, having stopped, not to proceed until such can be done with safety.

"Neither duty comes into existence unless and until these three conditions exist: (1) A train must be 'approaching' the crossing; (2) the approaching train must be 'plainly visible', and (3) The train must be 'in hazardous proximity' to the crossing. Before either duty can be said to have been absolute in a particular case so as to form the basis of an instructed verdict all three conditions must be conclusively established by the evidence.

"We are next confronted with the problem of deciding what test is to be used in determining whether, in a given case, an approaching train was 'plainly visible' and 'in hazardous proximity' to a crossing so as to give rise to the statutory duty to stop.

\* \* \* \* \* \*

" \* \* \* In determining whether or not the defendant's train was plainly visible, however, you must determine whether it was plainly visible to a person exercising reasonable care under all the facts and circumstances, as shown by the evidence \* \* \*.

\* \* \* \* \* \*

" \* \* \* We see no sound reason to be dissuaded from applying the common-law test of the reasonably prudent man in determining whether, under the statute, a train was 'plainly visible' and in 'hazardous proximity' to a crossing."

Back to the case at bar, plaintiff's driver was, by virtue of the statute, under a conditional duty to stop 50–15 feet before the track upon which the train was approaching; such condition precedent to the duty to stop being *that a train was plainly visible and in hazardous proximity to the crossing.* The McFerrin case, supra, says *that in determining whether or not the defendant's train was plainly visible, etc., you must determine whether it was plainly visible to a person exercising reasonable care under all the facts and circumstances as shown by the evidence—and "we see no sound reason to be dissuaded from applying the common-law test of the reasonably prudent man in determining, whether, under the statute, a train was 'plainly visible' and 'in hazardous proximity' to a crossing."*

Since the common law test is applicable under the McFerrin case, we cannot convict plaintiff's driver of contributory negligence as a matter of law if there are *any issuable facts* to go to the jury—or if there is *any evidence* sustaining the jury's acquittal of plaintiff's driver of contributory negligence. The jury acquitted plaintiff's driver of contributory negligence in each matter inquired about by the Trial Court.

We come now to examine the record before us to see if there is any evidence to support the findings of the jury acquitting plaintiff's driver of contributory negligence —or *any evidence* which could make for issuable facts as to whether he was negligent.

Plaintiff's driver stopped prior to approaching the first set of tracks, and looked to his right and left and saw nothing; and then proceeded at about seven to ten miles per hour across the tracks; he heard the sound of a diesel engine from his left; he saw a caboose on a freight train lighted up on his left. He was afraid that the freight train upon which he saw the lighted caboose might back over him so he watched the caboose and did not look to his right again until just prior to the time the train struck him; he saw the train, but at a time when it was too late to stop before crossing the track and too late to back off the track the train was approaching on from the right. The question is whether plaintiff, in watching the caboose to his left, and not looking to the right more often than he did, "failed as a matter of law" to keep a proper lookout. The test is what a reasonably prudent man would have done under the circumstances. The McFerrin case, supra, says: "In determining whether or not the Defendant's train was plainly visible (thereby requiring plaintiff to stop), however, *you must determine whether it was plainly visible to a person exercising reasonable care under all the facts and circumstances."*

Certainly plaintiff should have kept an eye on the caboose since he recognized it as a danger and a hazard. 35 T.J., Sec. 348, says:

"Where the conditions at the crossing were such that some difficulties were presented to the traveler, who was consequently required in the exercise of ordinary care in some degree to divide his attention between such difficulties and the more serious and imminent risk that a train may be approaching, *it is for the jury to say whether he acted with due caution. The verdict will not be set aside merely because it appears that if he had looked at the proper moment in approaching the crossing he would have seen that the train which ran him down was approaching*—assuming, of course, that the train was traveling at an excessive speed * * * or in some other respect the defendant was found to be guilty of negligence."

Our Supreme Court, in Kirksey v. Southern Traction Co., 110 Tex. 190, 217 S.W. 139, 140, says:

"Conceding that the physical conditions were such that as Kirksey approached said crossing he might have discovered the approaching trolley car in time to have avoided the collision *had his thought and attention not been*

*distracted* by Deloach's signals to stop and his movement toward the automobile as it slowed its speed, *there remained for the jury the question whether under all the facts and circumstances, including said distractions,* a reasonably prudent person, in Kirksey's situation, would or would not have done substantially as he did."

In Chicago, R. I. & G. Ry. Co. v. Laro, Tex.Civ.App., 273 S.W. 684, 685, W/E dis., the court says:

"[The facts] show the intersection of a railway by a public road, environed by conditions which presented at least slight difficulties to the traveler, who was required in the exercise of ordinary care to in some degree divide his attention among those difficulties and the more serious and imminent danger of approaching trains. In other words, he was passing through a situation requiring the use of discretion on his part. It was not a case where the traveler was confronted with no other danger or difficulty than that of an approaching train, in which case only is a court permitted to assume from undisputed physical facts that, because he deliberately walked into the single and obvious danger, the traveler is guilty of contributory negligence as a matter of law.

"*Whether or not the deceased wisely exercised his discretion in the situation through which he was obliged to pass is not a question for decision here. Whether he properly divided his attention among the several objects of danger, or accurately gauged those dangers, or looked down the track at the precise psychological moment—if indeed a psychological moment was ever available to him, in view of the terrific speed of the train—these questions are not now in the case. It is sufficient for this court to determine that the peculiar facts of the case called for the use* *of some degree of discretion by the traveler, and, when that is determined, the decision relates back to the finding of the jury, which, being supported by the testimony, must not be disturbed.*"

In Beaumont, S. L. & W. R. Co. v. Richmond, Tex.Civ.App., 78 S.W.2d 232, 235, distance, had an unobstructed view of the crossing covered by appellee's W/E dis., the court says:

"It is true that appellee, for a long freight train, but Kirksey v. Southern Traction Co., 110 Tex. 190, 217 S.W. 139, is authority for the proposition that, *though one may have an unobstructed view of the crossing, yet the 'distractions' of the moment may make the issue of contributory negligence a fact issue for the jury * * *.*"

35 T.J., Sec. 348, continues:

"Thus a verdict is sustainable where the attention of the traveler was diverted by * * * a train on another track."

In Texas & Pacific Ry. Co. v. Midkiff, Tex.Civ.App., 275 S.W.2d 841, 844 (no writ history), the court says:

"*The rule in crossing accidents such as this is that an injured party will not be deemed guilty of contributory negligence as a matter of law when there is some explanation comparable with reason why he did not see the train with which he collided in time to avoid the collision. When some care is shown the sufficiency thereof is a question for the jury.*"

Under the record in the instant case, plaintiff saw the caboose and the danger it implied by backing over the crossing. Can we say as a matter of law that plaintiff was not justified, as a reasonably prudent man, in not looking to his right more than he did?

It is not in evidence that plaintiff did not look to his right. He looked when he

stopped at the first track. He looked again just before the train hit him. He simply did not look to the right soon enough the last time to stop before he got on the track the train was on, or to get off such track before the train hit him. He was not wholly neglecting to look to the right. He looked twice, he didn't look more often because he was watching the train on his left, a source of known danger. This factual situation poses acts of caution on plaintiff's part; even to looking to his right on two occasions.

◼ When the evidence discloses clearly a lack of ordinary care, we should not hesitate to set aside a jury verdict; *but where acts of caution are testified to and where full attention to the right was diverted by a train on the track to the left, we think, under the authorities cited, this makes for a jury question.* Here the jury heard the evidence and acquitted plaintiff of contributory negligence. In reviewing such a finding we are confined to a consideration of the evidence most favorable to the verdict, as well as the inferences and conclusions therefrom most favorable to sustaining the verdict. If reasonable minds can differ as to the inferences and conclusions to be drawn from the evidence, and viewed in a light most favorable to sustain the verdict, then we cannot hold as a matter of law that plaintiff was guilty of contributory negligence. See Gifford v. Fort Worth & D. C. Ry. Co., 151 Tex. 282, 249 S.W.2d 190.

◼ In the case at bar plaintiff was taking steps and performing acts of caution for his own safety, to-wit: He stopped at the first track; looked both ways; proceeded cautiously; looked to the left and saw the lighted caboose; and finally looked to the right and saw the approaching train, albeit too late to stop before getting on the track. From the foregoing, and tested in the light of the authorities cited, we cannot say as a matter of law that plaintiff failed to keep a proper lookout, or that the train *to the right was plainly visible to a person*

*(plaintiff) exercising reasonable care under all the facts and circumstances in this case.* We are not called upon to determine what our judgment would have been if the evidence had been presented to us in the first instance; a jury has passed on the issue of plaintiff's contributory negligence; a trial judge has refused to set aside their verdict; and viewing the record as we must, in the light most favorable to sustaining the verdict as well as the inferences and conclusions from such evidence most favorable to sustain the verdict, we cannot say that plaintiff has been convicted of contributory negligence as a matter of law. To so hold would do violence to Article 6701d, Vernon's Ann.Civ.St., as interpreted by the majority opinion of our Supreme Court in the McFerrin case, supra.

Defendant's 1st and 2nd contentions are overruled.

We have carefully weighed the evidence and have concluded that the verdict of the jury is not against the great weight and preponderance of the evidence. Defendant's 3rd contention is accordingly overruled.

◼ Defendant's 4th contention encompasses it points on appeal 4 through 15. Points 4 through 11 complain of the Trial Court's refusal to submit to the jury defendant's requested Special Issues 1A, 2, 3, 4, 5, 6, 7 and 8. The requested issues inquire of the jury of the same matters inquired about in the Court's charge in Issues 18–24A, except the requested issues use the words *"the track upon which the train was traveling"*, rather than the words "the nearest rail of such railroad". The Trial Court, in submitting the issues, used the words of the statute (6701d, § 86), which would be all right if the crossing had been a single track crossing. Here we have an eight track crossing, with the collision occurring on track No. 4, some 93 feet from the first track or nearest rail of the crossing. The issues requested by defendant were clearly raised by the pleadings and defendant was entitled to have them sub-

mitted unless they were substantially covered by the issues submitted by the court. The issues submitted by the Trial Court inquired about *"the nearest rail of such railroad"*. As noted, this was some 93 feet from the place and track where the collision occurred. Since the statute is intended to apply to the track upon which there is an approaching train, defendant was entitled to have the issues submitted framed to apply to the track upon which the train was approaching and upon which the collision in fact took place. The manner of the Trial Court's submission was calculated to confuse the jury, and the record reflects that the jury in fact did become confused, and propounded in writing to the court the following question: "The jury wishes to know if in Special Issue 18 the 15 ft. referred to is in relation to the Main track or the first track driving west." The court replied to such question: "Ladies and Gentlemen of the Jury: The Court regrets that he is unable to answer the question propounded to him." We think that defendant was entitled to have the requested issues submitted and that the failure of the Trial Court to submit same requires a reversal of this case. See Panhandle & Santa Fe Ry. Co. v. Karr, Tex.Civ.App., 257 S.W.2d 486, affirmed 153 Tex. 25, 262 S.W.2d 925; Lackey v. Gulf, C. & S. F. Ry. Co., Tex. Civ.App., 225 S.W.2d 630.

Defendant's points 12, 13, 14 and 15 complain of the Trial Court's failure to submit other issues requested by defendant. Point 12 is levelled at the Trial Court's refusal to submit Requested Issues 13, 14 and 15, on proper lookout. We perceive no merit to this contention since the Trial Court, in Issues 16, etc., of its charge, submitted substantially the issues contended for.

We deem it unnecessary to discuss points 13, 14 and 15, 16 and 17, in view of the disposition being made of the case.

We sustain defendant's points 4 through 11 and the cause is accordingly reversed and remanded.

TIREY, Justice (dissenting).

At a former day of this term, this court, in a unanimous opinion, sustained appellant's Points 1 and 2, and reversed and rendered this cause. I am still of the opinion that our action in so doing was correct.

I quote substantially appellant's Points 1 and 2:

1. The court erred in overruling appellant's motion for a peremptory instruction and refusing its Requested Special Charge No. 1, because (1) the evidence is wholly insufficient to show that the collision was proximately due to any negligence on the part of the operator of appellant's train, and (2) because the evidence conclusively shows that the collision was proximately due to the negligence of appellee's employee, Warner McCarty, the driver of the truck, while acting in the course of his employment.

2. The court erred in overruling appellant's motion for judgment non obstante veredicto, because the evidence is wholly insufficient to show that the train operatives failed to keep a proper lookout, and that such failure, if any, was the proximate cause of the collision, or that the speed of the train was a proximate cause of the collision; and, further, because the evidence conclusively shows that the collision was proximately due to the negligence of appellee's employee (a) in failing to keep a proper lookout for trains while approaching the railroad crossing; (b) in failing to stop within 50 feet and not less than 15 feet from the nearest rail of the railroad track upon which the train was traveling; and (c) in proceeding upon said track when he could not do so safely; the train then being within 1500 feet of the crossing, emitting a signal audible at such distance, and plainly visible and in hazardous proximity to the crossing.

In appellant's brief we find substantially the following statement: This train-truck collision occurred in the city of Corsicana on March 12, 1955 at about 1:00 o'clock A.M. The motor truck and refrigerator trailer owned by appellee was being driven by his employee, McCarty, and was struck by appellant's southbound passenger train. Appellee sought recovery for injuries to his property and appellant reconvened for expense of repairs to its Diesel engine. Immediately prior to the accident the truck was headed west on East Collin Avenue but was stopped on the main line of the track at the time of the collision about two blocks north of the passsenger depot. The truck driver was approaching the crossing from the east and had crossed a switch track located about 123 feet east of the main line track, and another switch track located east of and next to the main line, and, at the time of the collision, the truck and trailer were standing motionless. On the first switch track, east of the main line and south of Collin Avenue, was a caboose and a string of cars which were not in motion, the engine having been detached and moved down south of the depot, where it was parked on a transfer track waiting for a Cotton Belt connection. From a point about 120 feet east of the main line track where the collision occurred, looking in a northerly direction, there was no obstruction to a person approaching the main line track from the east from seeing a train approaching the crossing from the north.

Appellee's case is based almost entirely upon the testimony of his truck driver. It is substantially as follows: That the over-all length of the truck and trailer was 45 feet; that he was traveling westward on Collin Street about 15 miles an hour and stopped about 15 feet from the first track; he looked up and down the track and did not hear any kind of whistle or bell to his right, but did hear what appeared to be a switch engine switching back and forth, and didn't know where it was; that there was no flagman or automatic signal light at the crossing—only the regular cross arm signal—warning the public that this was a railroad crossing; that from a point about 1500 feet north of Collin Street the railroad tracks are in a continuous curve; that approaching the main line railroad track from the east there is track 1, track 2, track 3, and the main line track 4; that track 2 is a dead track which starts on the south side of the street and stops on the north side, but the driver did not know it was a dead track at that time; that he stopped before proceeding across the first track 15 to 20 seconds—long enough to look both ways; that what he was watching mostly at that time was the caboose on the freight train that had attracted his attention from the time he left the highway; (as I understand the driver's testimony, when he turned from the highway into Collin Street, he was proceeding from the highway on to Collin Street at substantially a right angle as he approached the crossing); that he has measured from the point where he stopped to the center of the main line track, and that it is about 138 feet; that looking north from that point "you can see the continuation of the railroad track about 1150 feet—you can see from Collin Street almost to Third Street;" that the train that struck him was traveling south on the main line track; *that he looked back to his right again after he got about even with the caboose that was sitting on this No. 2 track, which was the track immediately east of the main line; that the caboose was located about 15 to 20 feet south of Collin Street; that no part of it was across the public street; that he then looked to his right and saw the train, and up until the time he saw the train he did not hear the engine or bells from his right, and that his capacity to hear is not impaired in any way; that he does not wear glasses and his eyesight is normal, so far as he knows; that from the time he started up after he made his first stop, he did not look to his right any more except the time when he saw the train coming, and he was then just about even with the back of this caboose,* and the rate of his speed was then about five to eight or ten miles per hour, but does not know exactly; that these

Diesel trucks do not enable anyone to pick up at a great rate of speed at 50 to 60 feet; that they are sluggish; that when he looked to his right and saw the train coming, his first reaction was to stop as soon as possible, and then he tried to back the truck off the tracks and clear it; that the train was about 550 to 650 feet from his truck when he first saw it, and it looked like it was proceeding toward him at a rapid rate of speed; that in his judgment the train was going faster than 25 miles per hour; that from the time he first saw the train it took him from seven to ten seconds to bring his truck to a complete dead stop; that from the time he first saw the train until the time of the impact was from 15 to 20 seconds and that it took that 15 to 20 seconds for the train to travel that distance; that he heard the whistle blowing continuously and the engine of the train running, but did not hear anything else, such as brakes or anything like that; that he was not able to get his truck started in reverse and did not leave, or make any effort to leave the truck he was riding in before the train hit him; that it would take from 12 to 15 seconds under normal conditions to shift the gears and get the truck in reverse and get it moving; that the train struck the front part of the trailer and the back part of the tractor, the bulk of the front of the engine hitting the trailer and the right front corner of the engine hitting the back of the tractor; that after the impact the trailer spun around and jammed into the caboose, and the tractor also spun around and stopped diagonally to the tracks; that up until that time he had not turned off the motor; that the front of the train went to about the station, about two blocks, before it stopped, the passenger coaches stopping on the crossing; that at the time he drove upon the first track and until the time he arrived at the second track, he did not know that there was a train approaching him from the right, and was not trying to race any train across the track; that from the time he stopped his truck so that the trailer was across part of the main line he did not know of anything

he could have done to have extricated himself from that dangerous position; that in stopping the truck he just pushed the brake down as far as it would go and stopped it as fast as he could; that what prompted him to stop the truck, he just looked back and saw the train coming from the north and did not know what track it was on; that it appeared to him that he had farther to go to clear the tracks if he went forward than if he backed up, and that is what he tried to do; that if he had stopped 50 feet from the most easterly switch track and looked to the right, there was a mesquite tree to obstruct his view; that the building shown in Plaintiff's Exhibit No. 4 would have obstructed his view if he had stopped 50 feet from the first track; that he had an amber light on the right side of his trailer, at the top corner from the front, one at the bottom from the front corner and one in the center from the bottom, also a red light at the top on the back, and another one at the bottom; that after the train came around the curve there was nothing to obstruct the view of anyone riding the train looking down the tracks; that the train had a wig-wag light that shone on both sides of the track; that it would have to be as close as Fifth Avenue for that light to be shining down the track, because of the curvature of the track; that it is a continuous curve from Third Avenue on southward to Collin Avenue, and it begins to straighten out just about Collin, and from there on into the station it is almost straight; that he measured with a steel tape the distance from Collin Street to Third Avenue and it is approximately 1200 feet, and that it is about 375 feet from Collin Street to Fifth Avenue, measuring down the center of the track with the curve; that he couldn't see the signal light on Fifth Avenue and did not hear any bell from that direction prior to the time he stopped; that it is between 350 and 375 feet from Collin Street to that signal light; that when he first saw the train it was 550 to 650 feet away and was beyond Fifth Avenue; that he did not know of anything the fireman or engineer did to stop the train or to warn him other

than to blow the whistle continuously, that "he blew it steady from the time that I saw him until he hit me."

He further testified to the effect that he could look up the railroad track from Collin Street and see 1,200 feet to the north; that the lights he testified about on the side of his truck or trailer were about 2½ inches long and 2 inches in height and were the kind usually used—about six candle power—not designed for illumination but to mark the trailer and let any person know where the trailer is; that the train was about 550 to 650 feet from him before he saw it, and it had that oscillating light swinging back and forth, and also had a beam light on the front of it, and that if he didn't see the train with all of that big lighting equipment swinging back and forth until it was from 550 to 650 feet from him, it is possible that the engineer or fireman may not have seen the truck until they were much closer; that if they had an open track in front of them, he had an open view to the north of him; *"that open view is clear back to about 35 feet before I got to the first track;" that for 138 feet he had absolutely nothing to obstruct his view north;* that the caboose was about 15 or 20 feet to his left on the track east of the main line track; that the caboose did not obstruct his view, but he was watching it to keep it from backing over him; that he was watching the caboose and never did look to the north until he got about even with the caboose, when he looked and saw the train, and he was then about 15 to 20 feet from the main track; that when he stopped back approximately 25 feet from the first track the train hadn't come around the curve; "Q. *All right, from that point, 138 feet from the main track, until 18 feet of the main track, as I understand you, you never did look back to the north, is that right?* A. *That's right.* Q. *All right. So that you traveled that 116 feet between the time you claim you stopped down to that point 18 feet of the main track without ever looking back north, that's right, isn't it?*

A. *That's right;"* that his truck had good brakes on it and that at the time he saw the train he was going from 7 to 10 miles per hour, and that it would take him 25 feet to stop the truck when going 7 to 10 miles an hour with good brakes, and that it would take 15 to 20 seconds to stop, if going 15 to 20 miles an hour; *that from the time he stopped 138 feet from the track until he got on the track itself, he did not stop any more, but continued straight on until he got to the main line track and then he stopped;* that he started hearing train signals right after he turned off Highway 75; "Q. *From that point on until the collision took place, you heard those train signals almost constantly, didn't you?* A. *Yes, sir, at intervals all the way down."*

He further testified that he had lived in Corsicana for a number of years in the 30's and 40's and at that time was thoroughly familiar with the town and knew there was a railroad crossing there; that he saw the cross-buck sign and knew that a railroad crossing, like a busy highway, is dangerous to get on unless you know you can get across; that after he stopped on the railroad track he stayed there about 7 to 10 seconds before the train hit him; that it was from 15 to 20 seconds from the time he first saw the train and started stopping until the impact occurred; that if it took the train 15 to 20 seconds to travel that 550 feet, it was going 15 to 20 miles per hour, provided the figures are correct; "Q. Do you recognize this (Defendant's Exhibit No. 1) as being a true representation of the crossing about which we are talking? A. Well, sir, the photograph is of that particular crossing, yes. Q. Well, look at it right close and tell the jury whether it is a true representation as it appeared the day of the accident, except it is in daylight instead of at night time? A. Yes, sir."

He further testified to the effect that the area in the right portion of the picture is truly representative of what you see to the north as you approach the crossing going west, *after you get to within about*

*20 feet of the first track—that after you get that close to the tracks, it does show no obstruction whatever from a vehicle coming from the east or a train coming from the north;* that he knew the front of the train went more than a block but did not know how much more than a block it went after the accident; that as he approached the crossing he had his left window down and his right window may have been down; that he heard whistling all the way down from Highway 75, which he presumed came from the south; that Defendant's Exhibit No. 5 is a view of Collin Street and the main track of the railroad looking north; that Defendant's Exhibit No. 4 is a view of Collin Street looking eastward and the railroad crossing and the compress is to the right; that Defendant's Exhibit No. 3 is a picture of the crossing looking from the east to the west with the camera sitting back several feet from the crossing.

*He further testified to the effect that when he was 50 feet from the main line track, if he had looked to his right, the train would have been plainly visible* and at 40 feet from the main line track it would have been even more plainly visible, and at 30 feet it would have been even more plainly visible, and the nearer he got to the track and the nearer the train got to him, the more plainly visible it was, and that the nearer he got to the track from a point 50 feet away from the main track, the greater hazard it became; *that when he was 50 feet back from the main line track on that night the train was in hazardous proximity to him, if he had seen it; "Q. In other words, you were so close to the track and the train was so close to you, it created a hazard by reason of its nearness, isn't that right? A. Moving at the rate of speed it was, why, yes;"* that when he looked to the north, that is when he was sure it was that train blowing its whistle and it continued to blow on up to the time of the collision, but he didn't know whether there was a bell ringing or not; that under certain atmos-

pheric conditions you could hear one of those whistles a couple of miles away; that this whistle is as loud as any others you hear; that he was not hurt in the accident.

He further testified to the effect that he heard horns blowing but they sounded from the south; that he did not hear any horn that he could place as coming from the north; that just before he entered the first track to go across the series of tracks, he looked to the right and there was no train visible, nor any swinging light visible, nor any shadow or reflection of any kind to indicate that a train was coming; that when he was 50 feet from the main line he did not have any reason to look to his right, either from sound, or otherwise, any type of warning; that the weight of the tractor was about 14,000 pounds and he would guess the weight of the trailer at about 12,000 pounds. (End of McCarty's statement.)

The fireman testified to the effect that he was riding in the left side of the cab of the engine, which was equipped with a Marrs oscillating light, and this light oscillates from side to side of the right-of-way as the train is moving and it also had a normal headlight; that it also had a Flaxon air horn of the loudest type, which, under the right conditions, you could hear a mile or two; that it also had an air valve bell which is turned on or off manually; that approaching Corsicana on the night of the accident he turned on the bell and Mr. DeLee, the engineer, started blowing the horn, and he was blowing his horn for all of the crossings intermittently as he was approaching; that he started blowing about 3/4th of a mile north of Collin Street and blew it continuously until he reached the Collin Street crossing; that there was not an interval of more than a second or two when he was not blowing that horn; that he saw the truck when it was around 150 to 200 feet from the crossing and the train was then about a block away; that they were intending to stop at the passenger station, had applied the

brakes, and were traveling around 20 miles an hour; that at the rate of speed the truck was going, it naturally was apparent that it would stop for the train, and the train was about 100 or 125 feet from the crossing when it occurred to him that the truck might not stop, and he then hollered to the engineer to "big hole" it, which means to go into emergency, which he immediately did, or was already in the act of going into emergency, because he heard the air exhaust just as soon as he finished hollering; that it takes two or three seconds for the brakes to take effect; that after the collision the train traveled approximately a block down to the next street, which was a good stop; that it could not have been brought to a stop sooner with the heavy equipment they had.

(It is without dispute that the engineer had died before the cause came to trial and we do not have the benefit of his testimony.)

Testimony was tendered to the effect that the engine that pulled the freight train into Corsicana immediately preceding the passenger train in question was stationed several blocks southeast of the point of collision, waiting and listening for a Cotton Belt connection, during which time the engine was standing idle on a transfer track several blocks from where the accident occurred and was not doing any whistling, nor was there any other engine in the vicinity at that time. Robert Powell and Bill Gallagher, who were at the dispatcher's office of the cab company in Corsicana, on Collin Avenue one block west of the scene of the accident, listening for trains in order to dispatch taxicabs to the depot to pick up passengers, heard the freight train come in about 12:30 that night and also heard the passenger train come in about one o'clock; that between the time they heard the freight train come in and the time they heard the passenger train coming, they did not hear any other whistle signals, but did hear the passenger train when it was down about First Avenue, coming over the underpass, and heard it whistling and getting louder as it came into town, and they also heard the impact. (End of statement taken from appellant's brief.)

In appellee's brief we find this statement:

"The statement of appellant is correct, as far as it goes, but we believe that it should be added that prior to the time plaintiff's driver drove upon the track, his attention was diverted to a caboose of the defendant railroad located to his left, lighted and emitting bells, whistles, etc., and that when he looked back to his right and saw the passenger train approaching he immediately applied his brakes, whereupon his truck was stopped within twenty feet; and about fifteen seconds later, before he could reverse his truck, the oncoming train had struck the trailer, causing the property damage for which recovery was had in the trial court."

Because of the importance of the question before the court, I think it pertinent to quote in part the testimony of the truck driver:

"Q. * * * approximately how far from the first track was it that you stated you stopped? A. Well, the front of the truck about twenty-five feet.

"Q. Now if the front of the truck was about twenty-five feet, approximately how far would you, sitting in the cab of the tractor, be from the first track? A. Approximately thirty-three feet.

"Q. What did you do when you brought the truck and trailer to a stop? A. I looked up and down the track.

"Q. Did you hear any kind of whistles or bells to your right? A. No, sir.

"Q. Did you hear any kind of whistles or bells to your left? A. Yes, sir.

"Q. Describe what you heard? A. Well, sir, I heard what appeared to be a switch engine switching back and forth.

"Q. Well— A. I didn't know where it was.

"Q. What kind of sounds did you hear from that switch engine? A. Whistles. * * *

"Q. Now, Mr. McCarty, when you left the Green Lantern Cafe you started hearing train signals right after you turned off Highway 75, didn't you? A. Yes, sir.

"Q. From that point on until the collision took place, you heard those train signals almost continuously, didn't you? A. Yes, sir, at intervals all the way down * * *.

"Q. Now, Mr. McCarty, how close was that train on you before you saw it? A. About 550 to 650 feet.

"Q. All right, now that train had a great big oscillating light on it, didn't it? A. Yes, sir.

"Q. And that oscillating light was swinging back and forth, wasn't it? A. Yes, sir.

"Q. It also had a beam light on the front of it, didn't it? A. Yes, sir.

"Q. Now, if you didn't see that train with all of that big lighting equipment swinging back and forth until it was from 550 to 650 feet on you, it is entirely logical and reasonable that he may not have seen you until you were much closer to him, isn't that correct? A. Well, I would say it is possible, yes sir.

"Q. Yes, sir. And it is reasonable and it is logical, isn't it? A. Well, sir, in the case I wouldn't say so, because if the train crew is sitting up there doing what they ought to be doing, then they have an open track in front of them and that's all they had on their mind.

"Q. Mr. McCarty, if they had an open track in front of them, you had an open view to the north of you, didn't you? A. Yes, sir.

"Q. And that open view was a good long ways back from the main track, wasn't it? A. The open view is clear back to about 35 feet before I got to the first track.

"Q. And how far back can you tell the jury that was from the main track? A. About 138 feet.

"Q. For 138 feet you had absolutely nothing to obstruct your view to the north, did you? A. No, sir.

"Q. Can you possibly tell the jury why you didn't see that train? A. Yes, sir.

"Q. Why? A. Because, as I said, there was a box car, that is, a caboose on a freight train.

"Q. Was that obstructing your view in any way? A. No, sir.

"Q. Uh, huh. That was to your left, wasn't it? A. Yes, sir.

"Q. And that was some, I believe you said, fifteen or twenty feet to your left on the track this side of the main track, wasn't it? A. Yes, sir.

"Q. So that didn't obstruct your view, did it? A. No, sir but it had my mind—I was watching that caboose to keep it from backing over me.

"Q. All right, let's get down to that, then. You were watching the caboose and you never did look to the north after that, did you? A. Yes, sir.

"Q. Well, if you did, can you tell this jury why you didn't see that train coming 1200 feet away with a big wig-

wag light on it? A. I looked and saw that train—that is, I looked and saw that train when I was about even with the caboose.

"Q. Uh, huh. How far was that from the main track? A. About 15 to 20 feet.

"Q. Was that the first time you looked to the north? A. No.

"Q. Why didn't you see the train sooner, then? A. Because when I stopped back here approximately 25 feet from this first track—

"Q. Yes, sir— A. * * * to look back there, that train hadn't even come around the curve.

"Q. All right, from that point, a 138 feet from the main track, until 18 feet of the main track, as I understand you, you never did look back to the north, is that right? A. That's right.

"Q. All right. So that you traveled that 116 feet between the time you claim you stopped down to that point 18 feet of the main track without ever looking back to the north, that's right, isn't it? A. That's right.

"Q. All right. Now did that truck of yours have good brakes on it? A. Yes, sir.

"Q. How fast were you going on that occasion? * * * A. At the time I saw the train?

"Q. Yes, and right prior to that time? A. I would say from seven to ten miles an hour.

"Q. From seven to ten miles an hour? (Witness nodded his head.)

"Q. What distance would it take you to stop that truck going just, say, ten miles an hour with good brakes? A. Well, sir, I would say 25 feet.

"Q. Takes you 25 feet to stop going seven to ten miles an hour? A. Yes, sir. * * *

"Q. All right. Now, Mr. McCarty, from the time you stopped 138 feet from the track until you got on the track itself, did you stop any more? A. No, sir.

"Q. You continued straight on until you got to the track and then you stopped, is that right? A. Yes, sir."

It is without dispute that the truck driver was familiar with the railroad crossing and knew that several tracks were there. It is also without dispute that he was alerted by train signals and whistles from the time he left the highway that a train was in the vicinity of the crossing, but he saw no light on any locomotive. As I understand the driver's testimony, his vision picked up the lights on the caboose when he left the highway. There is no testimony that he saw the engine or any light thereon at that time, but he did say that he kept his eye on the caboose because he was afraid it would back over him. There is no explanation as to why the truck driver's vision failed to pick up the headlight on the train or the wig-wag as he proceeded except the foregoing. Since the truck driver knew the overall length of his truck and trailer and the time it would take him to stop at various speeds, I think that under our common law concept, and bearing in mind that the driver heard the train signals and whistles and was afraid the caboose would back over him, that it was his duty to bring his truck to a stop and look both ways before crossing the track on which the caboose was standing because he thought a train was in dangerous proximity to him. I think the exercise of ordinary care required the driver to do this before proceeding across this track, but this he wholly failed to do. If the driver had brought his truck to a stop within not less than 15 feet of the nearest rail of the track on which the caboose was standing and looked both ways, he would have seen the approaching train, because, under his testimony it was plainly visible when he was within 50 feet of the nearest rail of the main track on which the train was approaching, and if he had brought his

truck to a stop within 15 feet of the nearest rail of the track on which the caboose was standing, he would have been only approximately 33 feet from the nearest rail of the main line track on which the train was approaching and in all events less than 50 feet. Although the driver says he was afraid the "caboose train" would back over him, yet he did not stop, nor did he increase or decrease his speed, nor did he look to his right until he was about even with the caboose. I think the driver's recitation of how the accident happened, plus all of the undisputed facts and circumstances surrounding him at the time, convicts him of common law negligence in that he failed to keep a proper lookout. If the driver had brought his truck to a stop, or glanced to the right within 15 feet of the nearest rail of the track on which the caboose was standing, he would have complied with Art. 6701d, § 86, and particularly subsections (c) and (d) thereof, because he would have been some 33 feet from the nearst rail of the main line track (or less than 50 feet), and under the undisputed evidence he would have seen the approaching train and could have avoided the accident. I think his failure to do so convicts him of statutory negligence.

In Hoey v. Solt, Tex.Civ.App., 236 S.W. 2d 244, 246 (no writ history), Mr. Justice Norvell makes this significant statement: "In applying the standard of a 'person of ordinary prudence,' the discretion or authority of a jury is admittedly extensive, but it is not without limit. This creature of the law and standard of comparison must conform to a pattern of behavior in keeping with the words used to describe him. He must be law-abiding and can not be wholly imprudent." That leads me to say that it is my view that the truck driver's testimony, plus the undisputed facts and circumstances, convicts him of a failure to exercise ordinary care, and that it conclusively appears from this record. That also leads me to say that since the truck driver was hearing train whistles, train signals and bells ringing from the time he stopped

at the switch track and saw the lighted caboose and believed it was a part of the train and that it might back over him, and since he did not stop or glance to the right or did not increase or decrease his speed, that reasonable minds cannot differ on the fact question that he failed to keep a proper lookout and that such failure was a proximate cause of the accident. A jury cannot draw unreasonable inferences. See Burt v. Lochausen, 151 Tex. 289, 249 S.W.2d 194, points 5 and 6, at page 199.

I think the following cases are pertinent and applicable on the question of proper lookout: In Muniz v. Panhandle & Santa Fe Ry. Co., Tex.Civ.App., 285 S.W.2d 809, 817 (n. r. e.), there is this statement: "In the instant case the driver of the automobile or the other occupant could have seen the approaching train at any time more than 100 feet from the crossing by a mere slight turn of vision to the left. It has been held that an injured party was not entitled to recover for injuries if his own negligence contributed to his injuries. McFall v. Fletcher, 138 Tex. 93, 157 S.W.2d 131."

In Lackey v. Gulf C. & S. F. Ry. Co., Tex.Civ.App., 225 S.W.2d 630, 632 (no writ history), the Court of Civil Appeals affirmed the action of the trial court in taking the case from the jury and in a factual situation similar to ours made the following statement: "(2) We know as a matter of common knowledge that a railway engine is not easily hid or obscured, and that had appellant looked he must have seen the engine. (3) One may not claim the right to recover, because he has looked and did not see, if conditions are such that had he looked he must have seen. Creal v. U. S., D.C., 84 F. Supp. 249, 252. See also Waring v. Harris, Tex.Civ.App., Austin [Court], 221 S.W.2d 345 Writ Ref. Our conclusion from the undisputed evidence is that the approaching engine was plainly visible to appellant and was in hazardous proximity to the crossing as appellant approached it, and appellant's failure to stop not less than 15 feet from the nearest rail of the track being used by the engine and his failure to

wait until he could safely proceed was a proximate cause of the collision."

In the case Gulf C. & S. F. Ry. Co. v. Gaddis, Tex.Com.App., 208 S.W. 895, 896, I find this statement: "It is well settled in this state that one who crosses a railroad track must, as a matter of law, exercise some degree of care for his own safety. All men in possession of their faculties are charged with knowledge that a railroad track is a dangerous place, and the law will not permit them to go upon the track, even at a public highway, without being charged with a recognition of the danger attending such action and the use of such care as ordinary prudence would dictate in so doing. Where no care whatever has been exercised, our courts uniformly hold that contributory negligence exists as a matter of law, and recovery is denied."

In the case of Baltimore & O. R. Co. v. Muldoon, 3 Cir., 102 F.2d 151, 152, I find this statement: "As he (plaintiff) approached the crossing he stopped at a point where in the driver's seat he was about eleven feet from the near rail of the first * * * track and looked to the left for approaching trains. * * * After looking to the left the plaintiff looked to the right and then proceeded to drive his truck across the tracks without again looking to the left. * * * By his own admission he failed to perform his duty, since his testimony indicated that he did not again look toward the left after he started up his truck and proceeded to drive it across the tracks."

Going back to the McFerrin case, Tex., 291 S.W.2d 931, 940, I find this statement which I think is peculiarly applicable to the factual situation here: "Ordinary care for his own safety required that he look to his right before passing through the stopping zone. We therefore hold, as a matter of law, that the train was 'plainly visible' when the deceased entered, or at least while he was within the statutory stopping area * * *. We hold, as a matter of law, under the facts and circumstances of this case, that a reasonably prudent person, sit-

uated as was the deceased, should have known that an attempt to proceed over the crossing ahead of the train, was hazardous. We accordingly hold, as a matter of law, that at the time the train became 'plainly visible', it was in 'hazardous proximity' to the crossing."

I am in accord with the majority opinion wherein the majority holds that Art. 6701d is intended to be applied to the railroad track on which the train is traveling and not the first track reached by the motorist as he approaches the crossing, if no train is being operated on the first track. I think any other view would render the statute futile.

The foregoing represents by views and I respectfully enter my dissent.